[No. S004635. Crim. No. 23805. Feb. 14, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
VON MAURICE HARRIS, Defendant and Appellant.

## COUNSEL

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Ivy K. Kessel, Susanne C. Wylie, Thomas L. Willhite and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EAGLESON, J.**—Defendant was convicted by a jury in the Los Angeles County Superior Court of the first degree murder (Pen. Code, § 189),[1] robbery (§ 213), and kidnapping for robbery (§ 209) of Stanley Fahey, with personal use of a firearm in the commission of those offenses. (§§ 12022.5 & 1203.06, subd. (a)(1).) The jury also found true special circumstance allegations that the murder was committed in the perpetration of robbery and kidnapping (§ 190.2, subd. (a)(17)(i) & (ii)), and returned a verdict of death.

At the close of the penalty phase evidence the court granted the People's motion to reopen the guilt phase and instructed the jury regarding intent to kill as an element of the felony-murder special circumstances. The jury then returned a special finding that defendant had the intent to kill or to aid in the killing of the murder victim.

Following the return of the penalty verdict, the court denied motions for a new trial and to reduce the penalty, and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

---

[1] Unless otherwise indicated all statutory references herein are to the Penal Code.

The principal guilt phase issue is defendant's challenge to use of a dual jury procedure in which he was tried jointly with his alleged confederate Larry Alan Davison, but separate juries decided the guilt of each defendant. All special circumstance and firearm-use allegations against Davison had been dismissed prior to trial, and he was alleged only to have been armed or a principal in the commission of an offense in which another principal was armed with a firearm. (§ 12022, subd. (a).)

Defendant claims the use of two juries was distracting, disruptive, and necessarily prejudicial because the jury that convicted him inevitably became aware that during periods when it was not present in the courtroom the jury trying Davison heard evidence inadmissible, but damaging, as to him. We conclude that defendant has failed to establish that the procedure was prejudicial to him. Although no statute sanctions the use of two juries, the procedure affords a practical and reasonable means by which to minimize the inconvenience and not inconsiderable burden on those witnesses who would otherwise have to testify in separate trials, and to conserve judicial resources.

Because there was no error prejudicial to defendant at the guilt phase of the trial, we shall affirm the conviction and special circumstances findings. Reversal of the death penalty is mandated by *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248], and *People* v. *Ramos* (1984) 37 Cal.3d 136, 150-159 [207 Cal.Rptr. 800, 689 P.2d 430], however.

## I

### FACTS

On December 7, 1982, 17-year-old Stanley Fahey was robbed of $350 at Jessup's Dairy,[2] a convenience store in the Palmdale area at which he was employed. He was then kidnapped, shot three times in the back, and left to die as the result of internal bleeding. His body was found in the desert outside Palmdale, but the physical evidence was inconclusive as to the location at which he was shot. One witness testified that he saw a car like that owned by Larry Alan Davison near the robbery site. It was one of very few cars there at the time of the robbery. Another witness, who had seen the car at that location earlier in the evening, identified defendant and Davison who, she said, appeared to be signaling to a third person. A third witness saw a car similar to that owned by Davison near the place at which the victim's body was found. Three witnesses testified regarding extrajudicial

---

[2] The dairy was also known as, and was referred to by some witnesses as, "P.M.S. Dairy."

statements made by defendant and Davison, one of which suggested that defendant shot the victim after Davison had told him not to shoot.

### A. *The Prosecution Case.*

The theory of the prosecution case was that defendant Harris, with Davison and Elton Juniel, had kidnapped Stanley Fahey in the course of a robbery and taken him to a desert dump area where defendant shot Fahey three times in the back as Fahey ran away with hands tied behind his back. The following evidence was offered in support of that theory.

Donna Rigby stopped at Jessup's Dairy to buy milk about 6 p.m. on December 7, 1982. Fahey, who was wearing a Palmdale High School letterman jacket, waited on her. As she waited in a line of cars she noticed a very oxidized, large car, like a Cadillac, with an aged and cracked vinyl or naugahyde top. Two men who were standing by the car appeared to be signaling a man who was walking around inside the dairy. Rigby watched the men for between five and ten minutes, occasionally losing sight of the man inside. She was upset by the suspicious behavior of the men, mentioning her concern to her sister-in-law who had accompanied her and, when she reached her home, to her husband.

Rigby contacted the police two months after Fahey's body was found, and on February 25, 1983, identified a photo of Davison as one of the men outside the store and a photo of defendant as the person who was inside the store. Rigby also identified Davison's car, which had been impounded, as the car she had seen at the dairy. She later inspected a recent Palmdale High School yearbook in her home and concluded that the third man present at the dairy on December 7, 1982, had been Elton Juniel, whose photo was in the yearbook. Rigby identified *both defendants* at trial, again stating that *defendant* Harris had been the person she had seen inside the store.

Beverly Hallowell stopped at the dairy about 8:46 p.m. on December 7, 1982. A white, older car with boxy, square tail lights was at the gas pump. She saw the driver, a cleanshaven White man about five feet nine inches tall, wearing a light blue windbreaker, with the gas pump in his hand, give the attendant, Fahey, what appeared to be money. At the time she stopped at the dairy it was very cold and the wind was approximately 35 miles per hour. The bakery racks were still outside. Fahey, who was wearing Levis and a Palmdale letterman jacket, told her he was ready to close as soon as the man in the white car was done.

Hallowell also saw an older model yellow-gold Cadillac at the curb at the edge of the dairy lot. The car was badly oxidized and had a light top. She

identified a photo of Davison's car as apparently the car she had seen. A short Black man with an Afro was standing on the passenger side of the car. A taller Black man with darker skin and slicked black hair was standing on the driver's side. She believed that defendant and Davison were the same height and race as the men she had seen. As Hallowell continued on toward her home she was passed by the Cadillac going very fast. A person in the passenger seat had his back pressed against the window as he faced the driver or the back seat.

Michael Gudim, a customer, stopped at Jessup's Dairy shortly before the usual closing time of 9 p.m. on December 7, 1982. It appeared that the market was closing. The portable bread and cake racks that were kept just outside the door when the market was open had been taken in. The lights were on, but no clerk was present. The cash register drawer was open, but held only checks, no cash. The money tray was not in the drawer. Another person arrived and called the sheriff. Deputy Budge arrived at the dairy at 9:18 p.m., three minutes after receiving the call. At that time there was a cold, blustery wind. It had been quite cool in the afternoon when Fahey arrived at work to replace the owner who had worked the morning shift. Budge and Deputy Taplin, who had also responded to the call, found half of a dollar bill and two pennies in the parking lot. The deputies suspected a robbery and possible homicide. They searched for shell casings, but none was found at that time. Three shell casings that may have been from .22-caliber bullets were found in the parking lot several days later. Searches of the same area in the interim had been unproductive, and, when found, the shell casings were lying in the open.

Fahey had worked at the store for only two and one-half weeks, but was known to his employer, for whom he had worked at another location for two months, as a reliable employee. His employer's wife had spoken to Fahey on the telephone at 7:30 p.m. The alarm company notified the employer at 9 p.m. that the store was open and the clerk gone. Some steps toward closing the store, steps normally taken about 8:30 p.m., had been accomplished. The south gasoline pumps had been shut down and readings taken. The south and east side gates had been closed. The south gate could be closed only by unfolding a portable rail or track on which it was pulled after unlocking a lock for which only the owner and the clerk had a key. The bread racks had been taken inside, one of the last steps before closing. Fahey had put bundled cash into a drop safe, a task that was performed periodically during the day so that the register would not contain large amounts of cash. Comparison of the cash register tape and the money found in the safe indicated that $356.63 was missing. Fahey's truck was still in the parking lot, the key hanging on a pegboard inside the store.

At 8 a.m. on December 9, Fahey's body was found, lying face down, in the desert about two miles from Jessup's Dairy. Two of three bullets that entered his body from the back could have caused his death. A fourth bullet had passed through the victim's jacket without causing injury. The bullets, small to medium size or between .22 and .38 caliber, had travelled upward at angles ranging from 60 to 85 degrees. The angle travelled indicated either that the victim might have been shot by a person standing above and at least 18 inches behind his prone figure, or that the victim was shot while running away and leaning forward in the manner that he had been taught to acceler-ate from a stopped position by his football and track coach. Death could have occurred no later than 4 p.m. on December 8. The nature of the wounds was such that the victim might have survived for several hours after being shot, or could have died within 30 minutes. The People's expert, a pathologist, after considering these factors and the abrasions on the face and head of the victim, believed that the force of the bullets caused Fahey to fall forward, hit his head, lose consciousness, and bleed internally while unconscious to the point that he was unable to get up. She found no evi-dence that the victim's hands had been tied.

No bullets were discovered in the body or at the location at which the body was found. The dirt in a 10-foot radius was dug up to a depth of three inches and sifted. Because the bottoms of Fahey's shoes were clean, it appeared that he had not walked on the ground in that area. Debris of a type found in the area and markings on Fahey's clothing were consistent with his having been dragged to the spot where the body was found.

On December 7, Robert Washburn had parked in the desert near the area where Fahey's body was found to "cool off" after an argument with his wife. Between 8 and 10 p.m., he saw what appeared to be a gold 1972 Cadillac come within 40 to 45 feet of him, turn, and depart. Because the car resembled that of a friend whose car had been stolen, he followed the car, which made a U-turn, passed him, and turned again into the desert. When the car passed him he saw that it had a white vinyl top, unlike his friend's car. He heard no gunshots during these observations. Washburn identified a gold Cadillac owned by Davison as the car he had seen. He testified that the two occupants were Black. One had a short haircut, the other an Afro. He pointed out Davison, who was at the police station while Washburn was there, as looking similar to one of those men.

Ronnie Linicome, who had been a paid informant for Sergeant Wachsmuth of the sheriff's narcotics unit, called Wachsmuth on December 13 and told him that defendant had bragged about the crime at the dairy. He testified that defendant and Davison were friends he had known for years. On December 10 or 11, during a visit by Linicome to defendant's

home, Linicome told defendant that he had heard defendant "killed a boy down at the dairy." He asked defendant if that was true, and defendant replied: "Yeah, killed the mother fucker . . . Larry tied his hands and took the mother fucker out in the desert and blowed his head off." When Linicome suggested he was lying, defendant said, "No, I'm serious. I can't stand White people. Just like I hate the mother fuckers." Asked why he had killed for $350, defendant replied he did not give "a fuck." Linicome did not report this conversation to the sheriff at this time. Several days later defendant came to Linicome's house. While defendant was there six men whom Linicome assumed were police came by and asked Linicome where they could obtain cocaine. After Linicome told them he did not know and the men left, defendant asked what they had wanted. Linicome told him, at which point defendant said that the men might be police, and that had they asked him, he would have blown their heads off just as he did a White boy. Linicome's sister testified that she had been present during that conversation between Linicome and defendant and that she heard defendant say he would "do them just like he did the boy."

Linicome testified that defendant then went across the street to a store. Larry Davison walked up and said, "I wouldn't go to jail for nobody for no murder." Linicome asked him what had happened, at which point defendant returned and threatened to blow Linicome's head off if he "snitched." Linicome also testified that defendant had twice threatened to kill him if he "snitched," and that he, Linicome, had seen the outline of a "little hand-sized gun" under defendant's clothing.[3]

Dovie Wilson, a friend of defendants Larry Davison, and Elton Juniel, testified that she had been at the home of Juniel's sister, Regina, shortly before Christmas 1982. While there she overheard a conversation in a bedroom, whose door was closed, about a murder. She recognized the voice of Davison say: "It was a clean robbery, a clean murder, clean getaway. Everything was clean." She then heard a voice she did not know ask: "So why did you kill the guy?" to which she heard defendant's voice reply: "Don't get me wrong or anything, but I'm the one that shot him." The unknown voice asked what Davison had to do with it, and defendant replied that "[i]t was Larry's idea in the first place." Wilson testified that defendant said "that he

---

[3] Sergeant Wachsmuth told Linicome that he was trying to develop leads about the murder. Linicome, who had spoken to defendant at that time, told Wachsmuth that he had information about it. Linicome called Wachsmuth later, after defendant had threatened to kill Linicome and his family. At the time he called Wachsmuth, Linicome's brother Albert had been arrested. Linicome discussed his brother's situation with the sergeant, and the sergeant told him that he should not worry about it. Wachsmuth then put Linicome in touch with two other officers, Finnigan and White, to whom Linicome gave his information. At the time he did so, Albert had been released. Linicome said he had not expected to be paid for the information regarding the murder, as he dealt in drugs, "not in people killing people."

took the guy from the dairy and they held him for a little while, then took him out to the desert, and said 'run,' and started shooting." Defendant said he had intended to shoot to scare the victim, but when Davison yelled at him, "No, Von, don't shoot it," defendant shot the victim because Davison had used his name and he did not want to go to jail. After defendant said that, Davison laughed, and she heard him say, "Elton drove and it was the coolest driving he had ever seen," to which Juniel responded, "[w]ell, when you got it, you got it."[4]

Dovie left the hallway where she overheard this conversation when it seemed that the people in the bedroom were coming out. She looked out the window two or three minutes later and saw Elton Juniel standing next to a car in which defendant Davison and a third person were sitting.

Phillip Thompson, a jail inmate who had been on a bus traveling between the Antelope Valley courthouse and the jail with defendant and other murder defendants, testified that he heard defendant make incriminating statements in conversations among the murder defendants. In March or April 1983, in a holding cell in the Antelope Valley courthouse, Thompson heard defendant tell Davison to "stop sniveling," saying, "you know, we're all in it together," to which Davison replied that he did not go to the dairy to do any killing, just to "game somebody out of some money." Defendant said, ambiguously, that "he" was as guilty as anybody. On another occasion in the holding cell, defendant said they were at the dairy too long because people were coming in and out, that they had wrestled the kid down and put him in the walk-in refrigerator, and Davison had commented that it was a lot of trouble for so little money. Defendant had said that the kid must have suspected he was going to be held up, because he put the money where they could not get it. Thompson heard defendant say that if the kid had done as he was told, there would not have been any trouble. On yet another occasion defendant told a young woman who was also being transported to contact Linicome and tell him "if he knows what's good for him, not to be in court." Davison made no comment when this was said.

No evidence linking Harris to the crimes was found in a search of his home, and experts who examined Davison's car found no blood or other body fluids to indicate that Fahey might have been transported in that car. Although there were numerous tire tracks in the area in which Fahey's body was found, none could be matched with the tires on Davison's car.

---

[4] Linicome testified that when investigating officers were questioning Dovie Wilson in a van, he and his brother Albert were present. He had heard that she had mentioned Albert to the officers, and told her that Albert could not have been involved as he did not "run" with defendant. She later acknowledged that she might have been mistaken about the other persons who had been present during the conversation.

B. *The Defense.*

Defendant offered an alibi defense through his father, Charles Harris, who testified that he, defendant, defendant's wife Denise, and their two children shared a home. When he arrived home on December 7, 1982, defendant was coming and going. Charles Harris left for a 6 p.m. session of traffic school and returned to the home at approximately 9:35 p.m., but it might have been as late as 10 p.m. At that time, defendant, Denise, and the children were watching television together.

The balance of the defense was cross-examination and introduction of evidence intended to impeach the prosecution witnesses, and evidence suggesting that the driver of the older, white, American-made car that had been at the dairy shortly before 9 p.m. had committed the crimes.

Caryn Cole and Denise Shroyer testified that they had driven past the dairy between 8:40 and 8:50 p.m. on the Tuesday before the Thursday on which they read about the death of Fahey. They were going to a group of apartments located behind the dairy, apartments in which Caryn's former boyfriend lived. The bread racks at the dairy were still outside, all of the lights were on, and all of the gates were still open. As they passed in front of the dairy and turned into the second driveway at the south corner of the dairy parking lot, they each saw the older, white car between the gas pumps with the driver's side door open. No one was in the car. They stopped for about a minute while Denise revved her engine to attract the attention of Caryn's friend, and then started to back out of the driveway. As they did so, the white car came up behind them, almost hitting Denise's car. She pulled back into the driveway to let it pass. The white car was moving fast enough to cause its tires to screech as it turned a corner. While they were driving on into town, the same car passed them, flashing its headlights and tailgating until it came up beside them and turned off. They had been driving between 35 and 55 miles per hour when that car overtook them.

Caryn believed the white car was a Chevrolet. When Denise was shown a Chevrolet Impala by police, she stated that it was not the car she had seen at the dairy. She believed the car she had seen was an older, white Nova with three across, square tail lights. Denise had seen a man in the dairy with Fahey when they drove past the white car at the gas pumps. The man was White, had short light brown hair. He wore a blue jacket and glasses. Denise believed he was about five feet seven inches or five feet eight inches tall and stocky. Fahey, whom Denise knew, did not wave as he usually did.

Denise noted that all of the lights were on, and all the gates open when she first drove by the dairy. When she was leaving, the lights by the south gasoline pumps were off. The gates were still open when she left.

Brenda White had lived in an upstairs apartment next to the dairy in December 1982. She recalled that on a night during that month, while she entertained visitors, a number of police cars had come to the dairy. Earlier she and her visitors heard two loud noises between 8:30 and 9 p.m. After the police questioned her about the events at the dairy, she assumed the sounds she had heard were gunshots. Before hearing those sounds she had looked out of the window and had seen a young man in a high school letterman jacket at the gasoline pumps. No cars were there. She looked out again after hearing the sounds and saw a light-colored American four-door car that could have been an Impala. The driver's door was open. A man walked toward the car, apparently coming from the dairy, carrying something. He was between five feet nine inches and six feet tall, heavy, with dark blond or light brown hair, and wore a dark blue windbreaker and matching pants. The object he was carrying was held under his jacket. It appeared to be the size of a six pack of beer. She did not think it could have been a cash register tray. The lights at the dairy were still on when she saw the man walking to the car.

White did not recall hearing the sound of an engine being revved at that time, but a few minutes after hearing the sound she thought were gunshots she did hear a car tear out of the dairy driveway with tires screeching. White also testified, inconsistently, that her guests did not leave until 20 to 30 minutes after she heard the loud noises, and as they were leaving she saw the man in a letterman's jacket. She was sure she saw him after the noises because that was when her company left. The white car was not in the parking lot when she saw him. The time between the loud noises and the time she saw the white car was about 40 minutes.

Joyce Mainer had pulled into a line at the dairy about 8:40 p.m. on December 7, 1982. A man in the dairy waited on a maroon-colored car which then left. The man who waited on the woman ahead of Mainer looked at Mainer, so she leaned forward in the light to allow him to see who she was. His actions seemed strange. He went over to the car ahead and the driver left. He was tall, had blond curly hair, wore Levi's and a pair of tennis shoes, but did not appear to be dressed warmly enough for the temperature. When Mainer pulled up and looked inside she saw another person in the dairy, and heard him ask the taller person what the woman had asked for. The tall man replied that she had asked for Winston Ultra Light 100's; he knelt down and looked at the counter; and then said, "we don't have any." The smaller person was about five feet seven inches tall and slim. He had blonde hair, and a short-sleeved light-colored sport shirt. She did not believe the jacket she saw on the man who waited on her was the letterman jacket depicted in a photo shown to her. The man who waited

on her knew, without checking, the price of the gallon of milk she purchased.

On December 8, 1982, Deputy Sullivan stopped and spoke with the driver of a 1965 Chevrolet parked on a dirt road about 150 to 200 yards from where Fahey's body was later found, but he did not obtain identification of the man. He saw the same vehicle on December 9, and determined that the driver was Arlen Shores. The car was an Impala, and had round tail lights.

Evidence to impeach several prosecution witnesses was offered either during cross-examination or during the defense case. Washburn's mother-in-law, a registered nurse with training in the prescription and administration of drugs, testified that she observed Washburn drinking alcoholic beverages in December 1982. He appeared to have a drinking problem and demonstrated the symptoms of a person combining alcohol with drugs. His use of Ritalin exaggerated the effects of alcohol. She had seen Washburn on the morning of December 7, 1982, at which time he showed symptoms of drinking. On cross-examination Washburn had acknowledged that he was undergoing psychiatric therapy, and had prescriptions for Tylenol, codeine, Valium, and Ritalin.

A deputy probation officer assigned to prepare a report for Thompson, testified that Thompson had been promised a "county lid," in connection with another case. No promises had been made to him with regard to this case.

Sergeant Finnigan testified that he had interviewed Dovie Wilson several times. She made inconsistent statements during these interviews regarding those present at the time she overheard the conversation in the bedroom of Regina Juniel's home. After first stating to Finnigan during an interview on January 9, 1983, that Albert Linicome was one of those present in the bedroom when she overheard the conversation about the robbery and murder, she stated on January 10 that she was not sure if he was present. The interview on January 10 took place in a van parked in front of her grandmother's house. Both Ronnie Linicome and Albert Linicome were present in the van when she changed her story.

Sergeant Finnigan also testified that his understanding of what Dovie had told him regarding persons present when she overheard the conversation differed after the interview on the 10th. Dovie told him during one interview that Regina had been in a back bedroom watching television and probably did not overhear the conversation. On other occasions she said that Regina was in the living room. At one point Dovie told him her

"girlfriend" was not present at all. After this interview with Dovie, Sergeant Finnigan decided not to execute an arrest warrant for defendant Harris, and Davison, who was in custody, was released. During a subsequent interview on March 6, however, Dovie said that Regina had been present and was in the living room of the home when Dovie returned to that room after overhearing the incriminating conversation. Dovie stated that no one else was present, and refused to identify Regina initially, because she had not wanted to involve anyone else.

Regina Juniel testified that her brother Elton was not living in the house where she lived with her mother in December 1982, and that during that month there was no time when Dovie Wilson, defendant, and Larry Davison were all at her house. She testified further that Dovie had not been in her house during December 1982, and she had never seen defendant at her house. Although Dovie testified that she had been watching television in the Juniel living room before she went down the hall and overheard the conversation in the bedroom, Regina testified that there was no television in the living room. Willie Juniel, mother of Regina and Elton, testified that to the best of her knowledge defendant and Davison had never been in the house, and that the only time Dovie Wilson had been there was in February 1983.

Linicome told the sheriff's department that defendant had threatened to kill him and his family if defendant was arrested. Linicome's brother, Albert, had been arrested for threatening a witness in this case, and a sheriff's sergeant told Ronnie not to worry. Albert was held for only 30 minutes, however, and had been released at the time Ronnie gave information to Sergeant Finnigan.

Kevin Woods gave an alibi for Elton Juniel for the period of the robbery/homicide. His wife, Brenda, confirmed that alibi, testifying that her husband and Elton picked her up at the junior high school at which she was a substitute teacher after work on December 7, took her home, left, and returned at 7 or 7:30 p.m. She then gave Elton a perm, a three-hour process, while Kevin prepared dinner.

## II

### JURY-RELATED ISSUES

A. *Dual Jury.*

Because the defendants' extrajudicial statements implicated not only the declarant defendant, but also the other, it was anticipated that some would not be admissible against the nondeclarant. (*Bruton* v. *United States* (1968)

391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].) For this reason the trial court, after denying the defendants' motions for separate trials, impanelled two juries. The jury trying the nondeclarant was to be excused when evidence was admitted of an extrajudicial statement by the other defendant implicating him, or when evidence relevant to only one defendant was to be heard. Because appellant challenges this procedure in his appeal, we will identify below the occasions on which one of the juries was excused.

### 1. *Procedure in dual jury trial.*

The two juries were separately selected. At the outset of the trial, the information charging each defendant was read only to the jury impaneled to try that defendant, with the other jury excused to wait in the jury room. Preinstructions were given with both juries in the courtroom, one seated in the jury box, the other in seats otherwise used by the audience. The juries switched locations each week.

The following special instruction was given with respect to the conduct of each jury toward the other: "Now, I am going to admonish you further, the jury seated in the jury box and the jury seated in the audience, during the pendency of this trial you are not to communicate with each other. If you see each other in the halls—we are trying to keep you separate and that is the purpose for this—you are not to communicate with anyone that you know is on another jury. You are not to have lunch. You are not to go anywhere with them. You are not to ride with them. You are to remain absolutely separate from each other.

"Further, you are not to, again, discuss the facts of this case amongst yourselves in this jury and the Davison jury."[5] The prosecutor then gave his opening statement, the Davison jury was excused, and counsel for defendant Harris gave his opening statement.

The People commenced presentation of their case-in-chief on March 13, 1984, before both juries. Trial continued with all witnesses testifying before both juries until March 21, 1984. Thereafter, the following occurred.

*March 21, 1984*

Counsel for Davison moved to have the Davison jury excluded during that part of Dovie Wilson's testimony in which she would testify regarding

---

[5] Counsel stipulated that "the jurors may be deemed to have been so admonished at each adjournment whether or not the admonition is repeated in full."

statements she heard defendant Harris make that implicated Davison. The motion was expressly predicated on the holding of this court in *People* v. *Aranda, supra,* 63 Cal.2d 518, 530, that any part of one codefendant's extrajudicial statement that implicates another codefendant must be excised before the extrajudicial statement may be introduced at a joint trial of the codefendants. Counsel for Harris later joined in the motion after counsel for Davison argued that unfairness to *Harris* would result if both juries were present during his cross-examination of Wilson since he intended to emphasize the greater or exclusive culpability of Harris.

The prosecutor argued that the proposed testimony was admissible against both defendants because the statements Wilson attributed to nontestifying declarants that implicated defendants were admissible as adoptive admissions. After the court ruled that cross-examination would be before only the jury trying the defendant whose counsel was cross-examining Wilson, counsel for both defendants withdrew their motions. Wilson's testimony on direct, on cross-examination, and on redirect, was then given before *both* juries.

Wilson, who was 17 years old at the time of trial, testified about the conversation she overheard in the home of Regina Juniel in December 1982.

Counsel for defendant Harris, followed by counsel for defendant Davison, then cross-examined Wilson, each eliciting from her a series of responses indicating lack of recall of her own past statements or testimony, lack of knowledge of other past events, and even a professed lack of knowledge of whether she lacked recall of those past events, statements, and testimony.

On redirect Wilson testified that she overheard defendant Harris say: "Larry said, 'No, Von, don't shoot him.'" Defendant Harris used both names in that sentence.[6]

---

[6] Defendant claims that Dovie Wilson's testimony was "tainted" by "overbearing police practices." All of the evidence on which he relies, principally the fact that at one point she was placed with Albert Linicome whom she had initially identified as a participant in the conversation she overheard, was brought out at trial. To the extent that this may have influenced her testimony, it went to credibility, not admissibility of the testimony. Without agreeing that the record supports defendant's characterization of either the police conduct or its impact as a "taint," we reject defendant's suggestion that we adopt a rule that would forbid the use of "testimony tainted by such overbearing police tactics." (Cal. Const., art. I, § 28, subd. (d).)

*March 23, 1984*

Darrel Rogers and his father, Gordon Rogers, testified during the morning session before the Davison jury only. Ronnie Linicome testified during the afternoon session before the Harris jury only.

The parties agreed that only the Davison jury should be present during Darrel Rogers's testimony. Counsel for defendant Harris asked that the Harris jury, which was not present at the time, simply be excused without reference to the fact that testimony would be heard in the absence of that jury. The court then directed the bailiff to excuse the Harris jury until the afternoon session. Counsel for Harris, and Harris personally, then stipulated that Rogers could testify in their absence, and stipulated that Rogers would identify Harris if Harris were present. Rogers then testified regarding an admission made to him by Davison that Davison and his "homeboy" committed a robbery that ended in a murder which Davison had nothing to do with. Other details of the admission identified the location as the Jessup Dairy. Gordon Rogers then testified, in the presence of the Davison jury only, that when he visited Darrel Rogers in a jail facility in late December 1982, he had a conversation with Darrel about this case, and that Darrel became upset during a later visit when Gordon Rogers told him that he had advised the sheriff about the first conversation.

During the afternoon session, the Davison jury was excused, Davison stipulated to his own absence, and Ronnie Linicome testified in the presence of the Harris jury about defendant's admissions.

*March 26, 1984*

Ronnie Linicome's testimony resumed on the morning of March 26, before the Harris jury only. He confirmed his testimony of March 23 that defendant had said to him that Davison had tied the victim's hands. Linicome was followed by his sister, Martha Stephens, and by Sergeant Wachsmuth. Their testimony related to matters intended to rehabilitate Linicome, and corroborate his testimony. The Davison jury was not present on this day.

*March 28, 1984*

Only a morning session was held.

Robert Washburn, who had testified earlier regarding his observation of the gold Cadillac in the desert on the night of the robbery and murder, was recalled and testified before both juries.

Dolores Rogers, followed by Gordon Rogers, then testified before the Davison jury only.

*March 29, 1984*

Phillip Thompson, the only witness on this date, testified before both juries.

*April 2, 1984*

William Gillis, John Trowbridge, Glenn Snyder, and Andrew Finnigan testified before both juries. Their testimony established that various details regarding the case had not been published in the two Antelope Valley newspapers prior to the preliminary hearing, and that the witnesses who made statements to investigating officers prior to that date could not have obtained their information from those newspapers.

*April 3, 4, 5, & 9, 1984.*

The People rested their case at the opening of the April 3, 1984, session. A motion by defendant for a directed verdict pursuant to section 1118.1 on the kidnapping and robbery special circumstances was denied. Counsel for Davison presented his opening statement to the Davison jury only, and thereafter, on April 3 and the three following trial days, a total of 18 defense witnesses testified before both juries.

*April 10, 1984*

Sergeant Andrew Finnigan was the last witness on April 9. His testimony continued on April 10, in the presence of the Harris jury only. No evidence incriminatory to Davison was elicited during this session. After another witness testified before both juries, Sergeant Finnigan was cross-examined first before both juries, and then before only the Davison jury.

*April 11, 1984*

The cross-examination, redirect, and recross of Sergeant Finnigan continued before both juries during the morning session on April 11, after which defendant Harris rested his case. Proceedings continued in the afternoon before the Davison jury only.[7] Two witnesses testified, after which Davison also rested. Three rebuttal witnesses then testified before both juries.

---

[7] Counsel for defendant Harris, given the option by the court, and knowing that Davison would offer an alibi witness, asked that the Harris jury be excluded during this session.

*April 12, 1984*

Two witnesses testified on April 12, one a rebuttal witness, and Sergeant Finnigan a surrebuttal witness, each before both juries. All parties then rested the guilt phase case. After arguments were presented to the Harris jury on April 17, the jury commenced deliberations and returned its verdict on April 24. The verdict was sealed pending deliberation by the Davison jury; the jury was excused until April 30, and on that day the verdict was announced. Proceedings for each defendant were conducted separately as of the session at which argument was presented to the Harris jury.

2. *Challenge to trial with dual juries.*

As demonstrated by the description above, during the Harris guilt phase trial there were three sessions during which testimony was received while the Davison jury was absent, and five during which the Harris jury was excused while the Davison jury heard testimony or argument. Only one witness, Linicome, testified before only the Harris jury regarding an out-of-court statement by Harris that implicated Davison. Defendant argues, nevertheless, that this dual jury procedure was both improper and prejudicial.

■ We consider first whether the procedure is a permissible means by which to achieve the goal of preventing prejudice to a defendant by the introduction of an extrajudicial statement made by his jointly tried codefendant. Defendant's observation that use of separate juries for jointly tried codefendants is not among the procedures sanctioned by this court in *People v. Aranda, supra,* 63 Cal.2d 518, is correct. In *Aranda,* the court adopted a judicially declared rule of practice intended to implement the command of section 1098 that jointly charged defendants "must be tried jointly, unless the court order separate trials." *Aranda* held: "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. . . . (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*People* v. *Aranda, supra,* 63 Cal.2d 518, 530-531.)[8]

---

[8] Subsequent to *Aranda,* in which the court deemed it unnecessary to decide whether exclusion of the codefendant's extrajudicial statement was constitutionally compelled, the United

It does not follow from the court's adoption of only those three alternatives that other procedures are improper if they serve the same purpose and do not prejudice the defendants. Indeed, in *Aranda* the court acknowledged the considerations favoring joint trials, considerations that prevail unless an alternative procedure is necessary to protect the defendants' rights. "In justification of joint trials it has been pointed out that they conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in the punishing of the guilty. These practical considerations of convenience must be subordinated when they run counter to the need to insure fair trials and to protect fundamental constitutional rights." (63 Cal.2d at 530, fn. 9.)

The court did not consider in *Aranda* whether a dual jury procedure was a permissible means by which to achieve the goal of facilitating the legislative preference for the trial of jointly charged defendants together. It is axiomatic, of course, that a decision does not stand for a proposition not considered by the court. (*People* v. *Myers* (1987) 43 Cal.3d 250, 265, fn. 5 [233 Cal.Rptr. 264, 729 P.2d 698]; *Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) *Aranda* does not, therefore, forbid procedures other than the alternatives it approved. The sole question here is whether the procedure utilized in this case ensured defendant a fair trial at which his fundamental constitutional rights were protected.

We are not persuaded by defendant's argument that use of a dual jury, as an abstract proposition or in the instant case, is necessarily prejudicial. In support of his attack on the procedure defendant claims that: (1) it is "cumbersome" and causes inconvenience to the jurors; (2) by increasing the projected duration of the trial, decreases the number of jurors on the panel from which the jury is to be selected who are able to serve without hardship and thus threatens the defendant's right to a jury drawn from a representative cross-section of the community; (3) creates a danger that jurors frustrated by the delay and inconveniences caused by the procedure will blame the defendant for their discomfiture; and (4) invites each jury to speculate that, during the time it is excluded, evidence damaging to the defendant whose case that jury is trying is being presented to the second jury.

. That any of these "dangers" may be a reality is sheer speculation on the part of defendant. Nothing in the dual jury procedure described above, or in

States Supreme Court held that admission of such a statement implicating a jointly tried co-defendant violated the Sixth Amendment right of the nondeclarant to confrontation and cross-examination. (*Bruton* v. *United States, supra,* 391 U.S. 123.) The court cited *Aranda* with approval in noting that alternative procedures can be fashioned by which the prosecution may have the benefit of one codefendant's extrajudicial confession or admission without infringing the codefendant's right of confrontation. (*Id.* at pp. 133-134, and fn. 9 [20 L.Ed.2d at pp. 483-484].)

the record of this case, supports that speculation. The times when and manner in which the Harris jury was excused are not shown to have been either cumbersome or inconvenient for the jurors. On most occasions the jurors were simply told when excused at the end of a session that they need not report until a particular time or day, a procedure that is common to all trials. And defendant makes no effort to support his claim that it is "inconvenient" for a juror to be given a morning or afternoon off during a trial. Breaks in the presentation of evidence are not unusual. Defendant makes no effort to substantiate his theory that such breaks, whether in a dual jury trial or otherwise, affect the jury's attitude toward the defendant. Nor does defendant point to anything in the record of this case which suggests that any greater number of prospective jurors were excused for hardship than could be expected in any trial of a capital offense.[9]

Nor can we agree with defendant that the jurors would necessarily speculate regarding the nature of the evidence presented during sessions from which they have been excused. Defendant claims that because his jury heard evidence of his highly incriminatory extrajudicial statements, and those statements also implicated Davison, his jury would speculate that in its absence the Davison jury was hearing different testimony that was also highly incriminatory as to both himself and Davison. We disagree. It is not clear that the Harris jury was even aware that evidence was being presented to the Davison jury or that the court was in session on some of the occasions when it was excluded.

The use of dual juries has been upheld in the only California case in which the issue was properly raised. (*People* v. *Wardlow* (1981) 118 Cal.App.3d 375, 382-387 [173 Cal.Rptr. 500].)

In every federal and state decision called to our attention by the parties, the court has upheld against constitutional attack the dual jury procedure as used in the case before it. Among the most recent of these decisions is that of the Appellate Department of the New York Supreme Court which acknowledged concerns regarding potential prejudice, but rejected the due-process-based claims of defendants jointly tried before separate juries that the procedure denied them a fair trial. (*People* v. *Ricardo B.* (1987) 130 App.Div.2d 213 [518 N.Y.S.2d 843, 847].) "Although the use of two juries as an innovative and economical alternative to severance has been upheld in

---

[9] At the outset of the Harris jury voir dire the court advised the prospective jurors that the anticipated length of the trial was two and one-half months. The only significant delay, one not shown to have been an inconvenience or to have affected the ability of any juror to serve, was the period between the selection of the Harris jury on February 27, 1984, and the March 13, 1984, date on which trial commenced. During those two weeks the Harris jury was excused while the Davison jury was selected.

other jurisdictions in the absence of demonstrated prejudice, the procedure has not been generally endorsed or encouraged, particularly by State courts (see, e.g., *State v. Corsi,* 86 N.J. 172, 430 A.2d 210; *Scarborough v. State,* 50 Md.App. 276, 437 A.2d 672; *State v. Lambright,* 138 Ariz. 63, 673 P.2d 1, cert. denied, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203). The Supreme Court of New Jersey has warned that 'the multiple jury procedure . . . can involve substantial risks of prejudice to a defendant's right to a fair trial' and that 'there are too many opportunities for reversible error to take place. We do not recommend it' (*State v. Corsi,* 86 N.J. 172, 178, 430 A.2d 210, 213, *supra*). Although the procedure is viewed more favorably by the Federal courts, . . . they hold that there must be no infringement upon due process in its use, or prejudice to a defendant's defense at trial (see, e.g., *United States v. Lewis,* D.C.Cir., 716 F.2d 16, 19, cert. denied *sub nom. Motlagh v. United States,* 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686; see also, *United States v. Sidman,* 9th Cir., 470 F.2d 1158, cert. denied, 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260). *We note that no court, State or Federal has held the procedure to be inherently prejudicial, nor has any court to date found specific prejudice warranting reversal in the matter before it.*" (*Ricardo B., supra,* 518 N.Y.S.2d 843, 847. Italics added.)[10]

In a recent federal decision, the First Circuit joined the Eleventh, Ninth, Sixth, and District of Columbia Circuits in accepting the use of dual juries, stating only that it found no abuse of discretion in impaneling the two juries as an alternative means by which to avoid severance in a trial in which statements by some codefendants that were irrelevant to the case against others were to be admitted. (*U.S. v. Lebron-Gonzalez* (1st Cir. 1987) 816 F.2d 823, 830-831.) In an opinion and order granting a prosecution motion to use dual juries in a conspiracy prosecution in which *Bruton* v. *U.S., supra,* 391 U.S. 123, would compel editing or exclusion of some statements by defendants, the Chief Judge of the United States District Court of the District of Puerto Rico endorsed the procedure: "The use of the dual jury, although novel before this Court, has nevertheless been used as an effective tool to solve problems similar to the ones described herein.

---

[10] While itself expressing reservations regarding the potential for prejudice in trial before dual juries, the court did not forbid use of the procedure in the future, instead noting the considerations that should be weighed in any decision to empanel multiple juries. "[W]e share the concern of the courts in our sister states that the use of the multiple jury procedure should be utilized only after careful consideration of all pertinent factors and when there are substantial benefits in so doing and no jeopardy to the rights of the defendants. The procedure should only be used in the extraordinary case where it is clearly warranted by the existence of such factors as the probability of successive protracted trials involving several defendants, prejudice to the prosecution by reason of an inability to repeatedly produce complaining and other witnesses at separate trials, substantial delay affecting the defendants' right to a speedy trial, or significant negative impact upon the available resources of the criminal justice system. And, of course, in the rare case in which the multiple jury procedure might be appropriate, care must always be taken by the trial court to insure that the due process rights of the defendants are not intruded upon." (518 N.Y.S.2d 843, 848.)

"The procedure is not to be condemned based on novelty alone since 'fair new procedures which tend to facilitate proper fact finding are allowable although not traditional.' [Citations.] The 'spectre of risks' should not deter courts from implementing innovative and resource saving procedures. [Citation.] The double jury has been adopted among other reasons as an economy measure, and 'as long as the procedure comports with the ethos of due process commanded by the rules of criminal justice' there should be no reason for its rejection. [Citation.] Four circuits have held that double jury procedure is not a violation of due process. The procedure is to be sustained as long as the defendant enjoys the rights given by the Constitution, the Sixth Amendment, and the rules." (*United States* v. *Gonzalez* (D.P.R. 1985) 610 F.Supp. 568, 571.)

The first federal appellate decision in which the use of dual juries was considered is that of the Ninth Circuit in *United States* v. *Sidman* (9th Cir. 1972) 470 F.2d 1158. There, too, a defendant objected on grounds that the procedure denied due process, speculating that the juries would infer that the defendants should be treated differently, or that one was a less active participant than the other in the charged robbery. On appeal, the court first rejected claims that the procedure violated the right to jury trial guaranteed by article III, section 2, clause 3, of the United States Constitution, the Sixth Amendment thereto, and the Federal Rules of Criminal Procedure. Addressing the jury trial issue, the court noted that the appellant had been accorded every right guaranteed him by the United States Constitution. He had a joint trial on all of the evidence that was admissible against him and his codefendant, and a separate trial on evidence admissible only against him under *Bruton,* supra, 391 U.S. 123. The due process claim was rejected with the observation that the defendant had not been "denied any fundamental right" but on the contrary enjoyed all the rights and privileges given to them by law.[11] (*United States* v. *Sidman, supra,* 470 F.2d 1158, 1169-1170.)

Other courts have voiced their concern about the potential for error or prejudice on which defendant rests his argument, but none has found such prejudice in actual practice. In *United States* v. *Lewis* (D.C. Cir. 1983) 716 F.2d 16 [230 App.D.C. 212, 72 A.L.R.Fed. 863], the court reviewed the cautious acceptance of the procedure by other courts, and it too affirmed a judgment imposed after trial before dual juries: "We follow the lead taken by our sister circuits while acknowledging the warnings eloquently voiced by various state courts. We accept the dual jury procedure so long as it

---

[11] Although the court stated that in upholding the conviction it was not endorsing the procedure, this statement was not based on articulated concerns regarding potential prejudice to defendants, but on concern that guidelines governing the procedure should be established by district court rule. (470 F.2d 1158, 1170.)

comports with the ethos of due process commanded by our stringent rules of criminal justice. In evaluating the application of the dual jury procedure in particular cases our focus too is upon whether there exists evidence indicating that the dual jury caused specific prejudice to someone's defense at trial." (716 F.2d at p. 19.)

Other circuits and the courts of many of our sister states have affirmed convictions after trial by dual juries even where the court finds the procedure to be unauthorized and requires additional safeguards in future cases. (See, e.g., *United States* v. *Hayes* (11th Cir. 1982) 676 F.2d 1359, 1366 ["neither has alleged any more than a generalized possibility of harm"]; *Smith* v. *DeRobertis* (7th Cir. 1985) 758 F.2d 1151; *United States* v. *Rimar* (6th Cir. 1977) 558 F.2d 1271, 1273 ["nowhere in the record do we find any continuing confusion, so pervasive as to render the trial unfair."]; *United States* v. *Rowan* (6th Cir. 1975) 518 F.2d 685; *United States* v. *Crane* (6th Cir. 1974) 499 F.2d 1385; *State* v. *Lambright* (1983) 138 Ariz. 63 [673 P.2d 1, 8, 41 A.L.R.4th 1165] ["[d]efendant in the instant case can point to no specific error occurring at trial"]; *Feeny* v. *State* (Fla.App. 1978) 359 So.2d 569, 570 ["[i]n the absence of demonstrated prejudice we are loathe to disapprove the novel procedure employed sub judice."]; *State* v. *Beam* (1985) 109 Idaho 616 [710 P.2d 526, 532] ["cases . . . are unanimous in refusing to reverse a conviction merely based on the use of this procedure, without some specific showing of prejudice."]; *People* v. *Ruiz* (1982) 94 Ill.2d 245 [447 N.E.2d 148, 153-154] [no per se denial of constitutional protection]; *People* v. *Johnson* (1986) 150 Ill.App.3d 1075 [502 N.E.2d 304, 314-315]; *People* v. *Knight* (1985) 139 Ill.App.3d 188 [486 N.E.2d 1356, 1361] [*triple jury* trial not per se violation of defendant's rights and no specific prejudice alleged]; *State* v. *Watson* (La. 1981) 397 So.2d 1337, 1342 ["appellant has failed to demonstrate prejudice"]; *People* v. *Brooks* (1979) 92 Mich.App. 393 [285 N.W.2d 307, 309] ["defendant was afforded a fair trial"]; *State* v. *Hernandez* (1978) 163 N.J.Super. 283 [394 A.2d 883, 885] ["defendant received a fair trial, . . . no prejudice resulted to him."].)

Nothing in the rules, statutes, or Constitution of California compels a different result in this state. We conclude, therefore, that the use of dual juries is a permissible practice. The procedure is not a basis for reversal on appeal in the absence of identifiable prejudice resulting from the manner in which it is implemented.

■ Like the appellants in the many out-of-state cases in which use of a dual jury has been asserted as a basis for reversal on appeal defendant here identifies no specific or demonstrable prejudice. Instead he attempts to distinguish the trial in which he was convicted as one involving complexities not present in the many cases in which the federal courts and courts of

other states have affirmed convictions. As our description of the means by which the evidence was presented to the juries confirms, however, this trial was not procedurally complex. It involved only two defendants and the only crimes charged were the murder and the related robbery and kidnapping. The scheduling of witnesses who appeared before only one, or separately before each jury, minimized the number of times defendant's jury was excused. The record simply does not support defendant's speculative assertion of prejudice.

Nor do we find persuasive defendant's claim that this trial should be distinguished because the trial court failed to use "meticulous care" by repeatedly admonishing the jury. Counsel for both defendants agreed that the admonitions need not be repeated at each session, and we do not question that decision. Counsel may have concluded that repeated admonitions to a jury that it should not speculate regarding the nature of the evidence being presented to the other jury would invite just such speculation by emphasizing that the other jury was hearing evidence to which it was not privy. And, as the People note, there were many instances in which the jury was excused while hearings were conducted pursuant to Evidence Code section 402, after which a witness testified.

We reject as well defendant's conjecture that the Harris jury would infer that the reason the Davison jury was absent during Linicome's testimony was his incidental reference to Davison when describing defendant's extra-judicial admissions, and would reason from that inference that there was evidence of defendant's guilt which it had not heard. He offers no support for the suggestion that hearing evidence from a single witness about an extrajudicial admission inculpating the other defendant necessarily or even likely implies to the jury that the second jury is hearing evidence to which it is not privy regarding the guilt of the defendant it is trying.

This court may reverse the conviction only if it concludes that use of a new procedure is error and "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243]) or that the procedure resulted in prejudice to the defendant which denied him the fair trial guaranteed by the Fourteenth Amendment. Because the dual jury trial was neither erroneous nor prejudicial, reversal is not warranted.

B. *Denial of Jury Selected From Representative Cross-section of Community.*

Defendant contends that the trial court's refusal to order payment of juror fees in excess of the statutory $5 daily fee authorized by section

1143 denied him the right guaranteed by the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution. The record does not support this claim. The record does establish that, notwithstanding the efforts of the court to avoid excusing jurors on the grounds of hardship when employers were unwilling to continue payment of salaries for the protracted period of a capital case, many jurors were excused for financial hardship, or because their absence from a job would cause serious hardship to an employer. The record does not establish, however, that any cognizable class of jurors received excuses on grounds of financial hardship.

Defendant acknowledges that the court rejected a similar claim in *People v. Milan* (1973) 9 Cal.3d 185, 195-196 [107 Cal.Rptr. 68, 507 P.2d 956]. In that case excuses were granted to any prospective juror who executed a hardship affidavit. He argues that the issue should now be reconsidered because this is a capital case in which the role of the jurors goes beyond fact finding and includes determination of the appropriate penalty, and because the juror fee has not been raised in the interim even though salaries have increased "dramatically." Defendant notes that 28 percent of the prospective jurors received hardship excuses in this case, and that at the time jury selection actually began less than half of the panel remained. On this basis he argues that it is clear that the "demographic balance" of the group from which the jury was selected had been upset.

Something more than speculation is required, however, to establish the denial of the claimed right. ■ In order to establish underrepresentation, and thus denial of an impartial jury drawn from a fair cross-section of the community, a defendant must make a prima facie showing: "(1) that the group alleged to be excluded is a 'distinctive, group in the community; (2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 587, 99 S.Ct. 664].) If the prima facie showing is made, the burden shifts to the People to rebut that showing.

A "cognizable group" for analytical purposes is one whose members are distinctive in that they share a common perspective arising from their life experiences in the group, a perspective gained because they are members of that group and one that cannot be properly represented by jurors who are not members of the group. (*People* v. *Harris* (1984) 36 Cal.3d 36, 51 [201 Cal.Rptr. 782, 679 P.2d 433]; *Rubio* v. *Superior Court* (1984) 24 Cal.3d 93, 98 [154 Cal.Rptr. 734, 593 P.2d 595].) Only when a defendant demonstrates

a significant disparity between the demographics of the panel or venire from which jurors are to be selected and that of the community does the question of whether the disparity results from systematic exclusion arise. (See *O'Hare* v. *Superior Court* (1987) 43 Cal.3d 86, 93 [233 Cal.Rptr. 332, 729 P.2d 766].)

 Defendant's claim fails on all grounds. He has not established that the persons excused on hardship grounds in this case constitute a cognizable class.[12] He suggests that the resulting panel consisted only of persons who did not need employment, or whose employers continued their salaries, but the record confirms neither this claim nor the implicit assertion that those persons who were excused constitute a cognizable class.[13] What the record does establish is that the trial court complied with this court's admonition in *People* v. *Wheeler* (1978) 22 Cal.3d 258, 273 [148 Cal.Rptr. 890, 583 P.2d 748], that it be "alert to prevent . . . excessive excuses on such grounds as sex, age, job obligations, or inadequate jury fees [which] can upset the demographic balance of the venire in essential respects."

## III

### GUILT PHASE ISSUES

A. *Prosecutorial Misconduct.*

In an attempt to persuade the court that cumulative prejudicial error so infected the trial as to require reversal, defendant identifies numerous events which he characterizes as instances of prosecutorial misconduct. Some in-

---

[12] Defendant asserts that self-employed persons "surely share a common perspective," but neither supports that assumption with anything in the record or of which judicial notice might be taken, nor demonstrates that none of the other jurors could have shared that perspective.

[13] Among those who sought excuse on grounds of financial hardship were an employee of the American Broadcasting Company, an elementary school teacher, the supervisor of a bank collection department, a hospital data processing employee, a senior engineer with responsibility for delivery of electronic equipment, an administrator for the thermochemical section of the Jet Propulsion Laboratory, a mortgage company employee, employees of Aerospace, Litton Industries, Hughes Aircraft, Lockheed and McDonnell Douglas companies, an employee of Lawry's, a nurse who was director of the Valley Office of the Visiting Nurses Association, and a quality assurance supervisor for a hydraulic research company.

Some were married, some single. Some supported children, some did not. Persons with Asian and Hispanic surnames were included. Nothing on the face of the record suggests that those excused, or those who remained on the panel, could be classified as a "cognizable group" under any set of criteria. Those with employers who would continue their salaries worked for private as well as governmental bodies. Some were professionals, others sales or clerical employees. In many cases the record does not establish the actual job performed by the prospective juror.

volved admission of evidence, others argument of counsel. As to most, there was neither objection nor misconduct. In one instance, the assertedly "improper" evidence was elicited not by the prosecutor, but by the defendant. Few of these "errors" or instances of misconduct, therefore, warrant extended discussion.

### 1. *Opening statement.*

In his opening statement, the prosecutor told the jurors that they would hear from persons who had criminal backgrounds to whom defendant had confessed, but that one witness was "a young lady who, I believe, you will perceive has a past and, I suspect, a future as clean as new-fallen snow."

Defendant contends that the prosecutor thereby engaged in misconduct, to which defendant objected and sought mistrial, by "vouching" for the character of Dovie Wilson and referring to character evidence that was never in fact introduced. We reject what appears to be an attempt to elevate hyperbole into misconduct.

Counsel for both defendants objected that the remark constituted character evidence that could not be properly offered in the absence of an attack on Dovie Wilson's character. Defendant argues that the remark was improper because evidence of a trait of a witness's character other than honesty or veracity is inadmissible to attack or support the credibility of the witness (Evid. Code, § 786) and evidence of good character may be admitted only after evidence of bad character has been admitted to attack the witness's credibility (Evid. Code, § 790). Defendant did subsequently offer evidence through the testimony of Regina Juniel that Dovie Wilson had told untrue stories several times, but, he claims, the People offered no evidence regarding her reputation for truth and veracity. Such misconduct during an opening statement, defendant argues, should be grounds for mistrial regardless of the good faith of the prosecutor just as it is when the misconduct occurs during closing argument. (See *People* v. *Bolton* (1979) 23 Cal.3d 208, 212-214 [152 Cal.Rptr. 141, 589 P.2d 396].)

The trial court denied the motion, expressing the view that the remark was not establishing the character of the witness, and even if improper was not enough reason for a mistrial. We agree. The remark referred not to evidence of Dovie Wilson's character that was to be introduced, but to the absence of evidence of prior criminal history. In context, the import of the statement appears to have been nothing more than an explanation that while the prosecutor intended to introduce evidence of defendant's confession through some witnesses whose credibility could be impeached with

evidence of prior felony convictions (Evid. Code, § 788), he would also call a witness who had no such history. Although this might better have been explained in less colorful terms, the purpose of an opening statement is not only to advise the jury of the evidence the prosecutor intends to introduce, but also " 'to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force, and effect.' " (*People* v. *Ramos* (1982) 30 Cal.3d 553, 575 [180 Cal.Rptr. 266, 639 P.2d 908], judgment vacated and cause remanded *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446], sub. opn. *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].) The remark served this purpose.

Even were we to agree with defendant that the statement was error rising to the level of misconduct as a statement regarding inadmissible evidence that the prosecutor knew would not be introduced, it was not prejudicial. ▮ The rule is well established, that prosecutorial misconduct in an opening statement is not grounds for reversal of the judgment on appeal unless the misconduct was prejudicial or the conduct of the prosecutor so egregious as to deny the defendant a fair trial. (See *People* v. *Purvis* (1963) 60 Cal.2d 323, 346 [33 Cal.Rptr. 104, 384 P.2d 424]; *People* v. *Lyons* (1956) 47 Cal.2d 311, 318-319 [303 P.2d 329].) Nothing in the record supports a conclusion that this isolated statement was made with knowledge that it was improper or for an improper purpose. Even assuming misconduct, however, it was not of a nature that requires reversal to protect defendant's right to a fair trial.

2. *Character evidence for truth or veracity. Impact of article I, section 28, subdivision (d).*

Defendant claims that numerous other instances of misconduct by the prosecutor so infected the proceedings as to deny him a fair trial and require reversal even in the absence of objection. ▮ He first claims that the prosecutor's examination of Sergeant Wachsmuth was improper and the testimony inadmissible insofar as it related to Linicome's reliability as an informant in past cases. He invokes the rule that "evidence of specific instances of a person's conduct is inadmissible to prove that on a particular occasion he acted in conformity with the trait of character indicated by his prior specific acts. (Evid. Code, §§ 1101, subd. (a), 787.) Thus, such evidence could not be introduced as proof of a witness' character for honesty or veracity, or their opposites, for the purpose of supporting or attacking the witness' credibility. (Evid. Code, § 787.)" (*People* v. *Antick* (1975) 15 Cal.3d 79, 96 [123 Cal.Rptr. 475, 539 P.2d 43]. Fns. omitted.)

The People contend that the statutory limitations on the admission of evidence relevant to a *witness's* honesty or veracity are no longer applicable

in criminal cases, except to the extent that exclusion is ordered pursuant to Evidence Code section 352. They rely for this proposition on the conclusion of the Court of Appeal in *People* v. *Taylor* (1986) 180 Cal.App.3d 622, 631 [225 Cal.Rptr. 733], that the addition of section 28, subdivision (d) (hereafter section 28(d)), the "Right to Truth In Evidence" provision of Proposition 8, to article I of the California Constitution had the effect of a pro tanto repeal of Evidence Code section 790,[14] in criminal cases.

Section 28(d), adopted on June 8, 1982, and applicable in cases in which the charged offense was committed on or after that date (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149]), provides in relevant part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103. . . ." Although Evidence Code section 1103, by implication may have preserved Evidence Code section 1101,[15] a question not presented here, section 28(d) contains no like exception that would preserve the exclusionary rule of Evidence Code sections 786-790, when the evidence relates to a witness's conduct, but is offered to attack or support the credibility of the witness.

Although the nature of the evidence that is the subject of Evidence Code sections 786-790 is similar to that in Evidence Code sections 1101-1103, the purpose for which it is to be admitted is not to prove conduct. We, therefore, agree with the conclusion of the Court of Appeal in *People* v. *Taylor, supra,* 180 Cal.App.3d 622, 631, that section 28(d) effected a pro tanto repeal of Evidence Code section 790, and find no basis on which to distinguish Evidence Code sections 786 and 787. Defendant himself makes no attempt to distinguish the sections, arguing instead that the electorate did not intend a wholesale repeal of the provisions of the Evidence Code governing admission of evidence when section 28(d) was adopted. ■ Rather, he suggests, the intent was limited to conforming California search and seizure law to the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment.

The construction of section 28(d) suggested by defendant is untenable. The intent of the electorate that both judicially created and statutory rules

---

[14]Evidence Code section 790: "Evidence of the good character of a witness is inadmissible to support his credibility unless evidence of his bad character has been admitted for the purpose of attacking his credibility."

[15]Evidence Code section 1101: "(a) Except as provided in this section and Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

restricting admission of relevant evidence in criminal cases be repealed except insofar as section 28(d) expressly preserves them is manifest. Had the intent been limited to rules governing the admissibility of evidence seized as a result of an unlawful search or seizure, there would have been no necessity to except expressly "any statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782, or 1103." The grant of authority to the Legislature to enact new exclusionary rules, but only by a two-thirds vote of each house, would be meaningless. Constitutional provisions, like statutes, must be read in conformity with their plain language (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744]), and in such a manner as to give effect wherever possible to every word. (*Steinberg* v. *Amplica, Inc.* (1986) 42 Cal.3d 1198, 1205 [233 Cal.Rptr. 249, 729 P.2d 683].) The presumption against implied repeal (see *In re Thierry S.* (1977) 19 Cal.3d 727, 744 [139 Cal.Rptr. 708, 566 P.2d 610]), on which defendant relies, has no application when the language is clear and does not permit a contrary understanding.

The restrictive reading of section 28(d) suggested by defendant was also rejected by this court in *In re Lance W., supra,* 37 Cal.3d 873, 888: "The inclusion in section 28(d) of specified exceptions to its mandate that 'relevant evidence shall not be excluded'—i.e, later enacted statutes passed by two-thirds of the Legislature; statutory rules relating to privilege or hearsay; and sections 352, 782, and 1103 of the Evidence Code—affords further evidence of the intent to restrict exceptions to that command. 'Under the familiar rule of construction, *expressio unius est exclusio alterius,* where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed.' (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].)"[16]

 Admission of this evidence of Linicome's past reliability as an informant, and the prosecutor's reference to it in closing argument, therefore, involved neither error nor misconduct. We need not decide if the prosecutor's further effort to bolster Linicome's credibility in the minds of the jury by suggesting that if his testimony was untruthful there were logical witnesses "available to Mr. Harris more than they are to me," whom de-

---

[16]Moreover, the ballot materials also refute any suggestion that section 28(d) was so limited. Unlawfully seized evidence was offered in the analysis of the Legislative Analyst as one example of the type of previously inadmissible, but relevant, evidence that the measure would affect. "Under current law, certain evidence is not permitted to be presented in a criminal trial or hearing. For example, evidence obtained through unlawful eavesdropping or wiretapping, or through unlawful searches of persons or property, cannot be used in court. *This measure generally would allow most relevant evidence to be presented in criminal cases, subject to such exceptions as the Legislature may in the future enact by a two-thirds vote.*" (Analysis by Legislative Analyst, Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 8, 1982) p. 32. Italics added.)

fendant had not called, was improper. The court sustained defendant's objection to the assertion of the prosecutor regarding the availability of those witnesses, and the prosecutor made no further reference to defendant's failure to call them. ▮ ▬▬▬ On consideration of the entire record we cannot conclude that this brief statement, if improper, was prejudicial.[17]

### 3. *Reference to other uncalled witnesses.*

Also of concern is the prosecutor's explanation in his rebuttal argument of his failure to call Linicome's brother Rudy to corroborate Ronnie Linicome's testimony. That explanation, given in response to defense argument about uncalled witnesses, referred to Rudy Linicome's taped statement, a statement that was not in evidence, and to the prosecutor's belief that Rudy Linicome's testimony would have added nothing since it would have been the same as that of Ronnie Linicome.

▮ If a prosecutor's argument refers to extrajudicial statements not admitted at trial, the defendant may be denied his right under the Sixth Amendment to confrontation and cross-examination, thus requiring reversal of the judgment unless the court is satisfied beyond a reasonable doubt that the misconduct did not affect the verdict. (*Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 643, fn. 15 [40 L.Ed.2d 431, 437, 94 S.Ct. 1868]. See also *Douglas* v. *Alabama* (1965) 380 U.S. 415, 419-420 [13 L.Ed.2d 934, 85 S.Ct. 1074]; *People* v. *Bolton, supra,* 23 Cal.3d 208, 213; *People* v. *Blackington* (1985) 167 Cal.App.3d 1216 [213 Cal.Rptr. 800]; *People* v. *Johnson* (1981) 121 Cal.App.3d 94, 104 [175 Cal.Rptr. 8]; *People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360 [14 Cal.Rptr. 354].) ▮ Short of misconduct of that nature which infringes on a specific guaranty of the Bill of Rights,

---

[17] Defendant claims that the prosecutor also improperly attempted to establish Linicome's credibility by eliciting testimony that Linicome was aware of Penal Code section 128, and that the section provided for the death penalty for a witness who gave perjured testimony leading to a conviction in a capital case. Again, there was no objection, and the question was proper.

Defendant offers no authority to support a conclusion that such inquiry is improper, arguing only that the question should be analogized to a statement by the prosecutor that he would not have called a witness if he did not believe the witness was truthful. In *People* v. *Perez* (1962) 58 Cal.2d 229, 245 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], on which he relies, however, the argument condemned as misconduct was an expression of the prosecutor's personal belief as to the reliability of the witness made to bolster the credibility of the witness in the eyes of the jury. We noted that a prosecutor may state his views as to what the evidence shows and comment on the credibility of witnesses in light of the evidence. Eliciting evidence that the witness is aware that he may be punished if convicted of perjury does not violate the rule applied in *Perez*. As we explained there the basis for the rule is that the jury may believe that the prosecutor possessed information in addition to that introduced at trial regarding the reliability of the witnesses, and might also attach undue weight to the opinion of the prosecutor. (58 Cal.2d at pp. 246-247.) Neither concern arises in the present context.

however, prosecutorial misconduct implicates the defendant's federal constitutional rights only if it is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*Donnelly* v. *DeChristoforo, supra,* 416 U.S. 637, 642-643 [40 L.Ed.2d 431, 436-437].)

In this case the prosecutor did not purport to recite the content of Rudy Linicome's taped statement; nor did he go further than offering his opinion that if Rudy were called, his testimony would not "add anything" to the evidence the jury had heard from Ronnie Linicome because the taped statement was "consistent."[18] We do not condone such argument, asserting as fact that the testimony of an absent witness would be cumulative and thereby suggesting its probable content, but defendant did not object and did not request that the court admonish the jury to disregard the argument. We note moreover that the argument was in direct response to the argument of defendant's counsel in which he challenged the motives and veracity of Ronnie Linicome, and asked the jury to consider why the prosecution had not called Rudy Linicome. The argument was not so clearly improper as to warrant our overlooking the failure of counsel to object since an admonition by the court would have been adequate to cure any harm from the remark. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.)

The People suggest that the failure to object may have been a tactical decision by counsel since the defense strategy involved an attempt to implicate Albert Linicome as a participant in the robbery-homicide, and to suggest to the jury that the Linicome family members would all give similar, but false, testimony. Even assuming, however, that the omission was not tactical, we perceive no prejudice to defendant from the possibly improper prosecutorial argument that could not have been cured by an admonition. The error may not, therefore, now be raised on appeal. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 759, fn. 21 [175 Cal.Rptr. 738, 631 P.2d 446].)

---

[18] Defendant also attempts to raise to the level of constitutional error the court's ruling on a hearsay objection when Linicome was asked on redirect if it had been George Jenkins who first suggested defendants' names as persons involved in the case, and Linicome responded "yes." Defendant argues both that there was no nonhearsay purpose for the testimony, and that it was evidence of an out-of-court statement by Jenkins that defendant was involved in the murder.

The redirect examination, however, was intended to explain Linicome's testimony on cross-examination that "everybody was going around saying they had killed the boy." That cross-examination explored Linicome's motives in going to the police, during which defense counsel had twice asked Linicome how he had become aware not only of the case but also of a connection between defendant and the case. Defendant therefore had already established that Linicome had been told by another person or persons that he and Davison were involved. The nonhearsay purpose was simply to identify the person who first suggested this, and to refute the defense implication that Linicome had fabricated his story in order to obtain the release of his brother Albert from jail.

We reach the same conclusion with respect to defendant's claim that the prosecutor committed misconduct in his closing argument when discussing the evidence that a White man driving a white car had been seen at the dairy at closing time. Referring to Arlen Shores, who had apparently been that customer, and whom defendant had attempted to suggest may have been the actual perpetrator, the prosecutor asked rhetorically why, if Shores had been involved the defense had not shown it. He then explained that the prosecution had not called Shores because the identity of the White man was irrelevant and "if we spend two, three weeks trying Arlen Shores and his alibi . . . ." Defendant argues that in this remark the prosecutor asserted that Shores had an alibi, when, in fact, there was no evidence regarding such alibi before the jury. In context of the entire argument, one emphasizing principally the lack of evidence that Shores was in any way involved in the case, we think it highly unlikely that the jury would seize on the prosecutor's comment as reflecting an assertion of evidentiary fact. ▇ ▇▇ Clearly, the possibility is so remote that had there been an objection the court could have easily corrected that impression by admonition.[19]

### 4. *Other alleged misconduct.*

#### a. *Thompson.*

Defendant also complains that prosecutorial misconduct undermined his attempt to impeach the credibility of witness Thompson during closing argument. He bases this claim on the manner in which the prosecutor objected to a sarcastic defense argument implying that Thompson had a motive to lie because he then had grand theft charges pending. What can only be described as a squabble between counsel regarding procedural matters followed. The court terminated the matter, stating that there had been a misstatement of evidence, and that the jury was to follow the law under the instructions of the court.

While the jury may well have been confused as to the procedural dispute and its relevance to the issue, we are satisfied that there was no prejudice to

---

[19] While conceding that no authority supports his claim, defendant also argues that it was misconduct for the prosecutor to refer in closing argument to defense counsel's opening statement and to note the failure of the defense to "deliver" by presenting evidence to support the outline he had drawn of the defendant's case.

This type of argument is proper and commonly used by counsel. The opening statement is one intended to assist the jury in understanding the evidence to come. While the jury is instructed that it is not evidence, the statement does offer a "story line" into which the pieces of evidence should fit. It is totally proper to remind the jury in this way that the statement was inaccurate in that some of those pieces are missing and that the verdict should rest only on evidence that has been admitted.

the defense. The message that Thompson had an incentive to curry favor with the prosecution and should not be trusted came through loud and clear both during his testimony and in counsel's closing argument.

Another asserted instance of misconduct involves the cross-examination of Ronnie Linicome *by defendant's own attorney.* When asked by counsel whether defendant told Linicome at defendant's home that he "shot the White boy," Linicome volunteered: "No, he brought it up—when I first went in and asked him about it, he said, 'Man they tried to lock me up on this murder in Long Beach.'" Defendant argues that even if the response was not attributable to the prosecutor's conduct, it was "extremely prejudicial" and denied him a fair trial and due process. This claim, too, fails. The rights he claims are indeed fundamental, but the constitutional prohibition is directed to conduct by the state and its officers. Counsel could have, but did not, ask that the answer be stricken and the jury admonished to disregard Linicome's statement.

Defendant next objects to the jury's consideration of Linicome's testimony regarding the confession in which defendant expressed his dislike of Whites. Again, counsel did not object, and there was no basis for an objection. Linicome testified that after defendant confessed to killing the victim, and Linicome asked him if he was "bull-shitting," defendant responded: "No, I am serious. I can't stand White people. Just like I hate the motherfuckers." The statement was clearly relevant and admissible. It was not only part of defendant's reaffirmation of the truth of his earlier confession, but revealed a motive for the killing. The racist content of the statement, to which defendant now objects, was not injected by the prosecutor or Linicome, but was defendant's own explanation of why he shot the robbery victim. Defendant's suggestion that this court should now weigh the probative value of the evidence in light of its prejudicial effect is meritless. ■ An objection on that ground invokes the discretionary authority of the trial court (Evid. Code, § 352; *People* v. *Green* (1980) 27 Cal.3d 1, 24 [164 Cal.Rptr. 1, 609 P.2d 468]) and may not be presented to an appellate court in the first instance. (Evid. Code, § 353, subd. (a); *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 723 [135 Cal.Rptr. 392, 557 P.2d 976].)

We reject for the same reasons defendant's claim that any issue was preserved for appeal regarding the admissibility of Linicome's testimony that defendant stated to him that he wished the officers who spoke to Linicome had asked defendant where they could purchase cocaine because he would "have blown their fucking heads off." Again the statement was relevant and admissible as part of a confession made to Linicome. The introductory portion of the statement, which defendant claims was irrelevant and prejudicial because it reflected animosity to police officers, was

followed by "just like [I] did a White boy." There was no prosecutorial misconduct in eliciting that testimony. Contrary to defendant's claim, the prosecutor did not, through Linicome's testimony, improperly present a picture of defendant as a racist who wanted to kill police officers. The prosecution presented evidence of defendant's extrajudicial statements confessing that he had killed Stanley Fahey. The references to his racist motive and his animosity toward the police were inextricable elements of the confessions. (Cf. *People* v. *Aranda, supra,* 63 Cal.2d 518.)

b. *"Griffin error."*

Defendant's claim that the prosecutor "commented" on defendant's failure to testify, thereby violating the rule of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], is frivolous. During argument the prosecutor referred to Ronnie Linicome's testimony about his taped statement, but said at one point: "That's also Mr. Harris in that same taped statement." Defendant's counsel immediately corrected the misstatement: "I am sure counsel inadvertently misstated that. That is Ronnie Linicome's testimony; not Mr. Harris." The prosecutor corrected himself, saying: "No, Mr. Harris didn't testify. This is Ronnie Linicome's testimony . . . ."

By no stretch of the imagination can this statement, in context, be characterized as a reference to defendant's exercise of his right against self-incrimination. There was no implication that an inference of guilt should be drawn from defendant's failure to testify. The remark was a permissible comment correcting a misstatement as to the state of the evidence. (See *People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959]; *People* v. *Frausto* (1982) 135 Cal.App.3d 129, 146-147 [185 Cal.Rptr. 314].) Even if the remark could be characterized as improper, it was harmless. "[A]s we made explicit in *Vargas,* . . . such indirect, brief, and mild references to defendant's failure to testify, without any suggestion whatever that an inference of guilt should be drawn therefrom, are uniformly held to constitute harmless error." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149].)

c. *Examination of Hallowell.*

Defendant cites as further misconduct Hallowell's testimony that she had been unwilling to speak to a defense investigator because he "is the type— the way he misrepresented himself to me." Defendant apparently attributes to the prosecutor the failure of the witness to limit her response to a statement that her reluctance was "because of her previous contact with the first investigator." The line of questioning, on redirect, was in response to an attempt by the defendant to suggest that Hallowell's failure to come for-

ward with information regarding the Black men she had seen near the dairy, and her refusal to discuss her evidence with a defense investigator, were evidence of recent fabrication. No misconduct is evident, however, as the record fails to support the inference defendant would have us draw that the prosecutor somehow failed to comply with the court's instructions, by which the court sought to avoid interjecting collateral issues. The defense on cross-examination, not the prosecution, elicited the explanation that the reason for her failure to contact the police to tell them she had seen two Black men at the dairy on the night of the crime, and for telling one defense investigator that she had not seen any Blacks there, was that she was afraid and had heard from customers in her husband's shop about threats made against witnesses.

Defendant complains also about a subsequent question by the prosecutor asking the witness if there was any other reason for her reluctance to speak to the investigator, to which she had replied that she was "scared," and claims that the prosecutor engaged in further misconduct when during closing argument he implied that defendant had threatened her. In context, however, the questioning and argument seem to have been directed only to refuting the implication that her testimony might have been untrue. No misconduct is established.

### d. *Examination of Scott.*

Jeffrey Scott, a gas station attendant who had known defendant in high school, was called by the People as a rebuttal witness to testify that he had seen defendant and Davison together in Davison's car, in Lancaster, late in the afternoon of December 7, 1982, a time when Charles Harris had testified that he and defendant were at home. Defendant now claims that Scott's response to questions put to him *on cross-examination* was an "improper aspersion" that was nonresponsive and prejudicial.[20] The object of these contentions was Scott's explanation of how he was able to recall the exact time he had seen defendants—a statement that he recalled telling his employer to keep an eye on "certain people," and he [Scott] "had a feeling to keep an eye on them when they first pulled in because we have never really been called friends."

Defendant's attempt to shift responsibility for eliciting this statement to the prosecutor by asserting that Scott was another prosecution witness who

---

[20] In a related and equally unmeritorious argument, defendant claims the prosecutor improperly attacked the credibility of Charles Harris by asking a question that implied that a Perry Norris lived in defendant's home while Charles Harris also lived there, and then followed up on the response with a line of questions the answers to which could raise a doubt as to whether the witness had been living in the home at the time in issue. We perceive no such implication, and no impropriety, in the questioning.

"managed to improperly impugn" defendants' character must fail. He points to nothing in the record to support an inference that the prosecutor either anticipated the question or encouraged the witness to volunteer that explanation.

Defendant's claim that reversal is required because Scott's testimony, and that of other witnesses identified above, constituted "improper" evidence fails for the same reason. In the absence of an erroneous ruling on an objection or request that a nonresponsive answer be stricken and the jury instructed to disregard it, there is no error. Defendant's argument that counsel had tactical reasons for failing to object either to the many instances of "misconduct" and to the admission of "improper" evidence is speculative. The governing principles are well settled. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:

"(a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; . . ." (Evid. Code, § 353; *People* v. *Robinson* (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834]; *People* v. *Hammond* (1960) 54 Cal.2d 846, 852 [9 Cal.Rptr. 233, 357 P.2d 289]; *People* v. *Smith* (1986) 180 Cal.App.3d 72, 79 [225 Cal Rptr. 348].)[21]

Defendant's invitation to the court to recognize "shortcomings" in the legal principles which govern, and lead us to reject, his claims of error and misconduct, is, in essence, a concession that many of his claims lack support coupled with a plea that we abandon the restraints imposed on appellate courts by the Constitution and statutes of California. This we may not and will not do. (Cal. Const., art. III, § 3, & art. VI, § 13.) Nor is it necessary to consider, as defendant suggests, whether the cumulative effect of all of the improprieties he has identified was so prejudicial that admonitions could not have cured it, and to overlook the failure of trial counsel to object. Since we do not accept defendant's characterization of the evidence in question as "improper" or the prosecutor's actions as "misconduct," such an assessment is unnecessary.

---

[21] Also speculative, and not supportive of defendant's assertion that the prosecutor engaged in misconduct, is his claim that the prosecutor's argument implied that defendant's wife had felony charges pending.

Comment on the failure to call a logical witness is proper, as is argument based on matters in evidence. We reject defendant's assumption that the jury would interpret the evidence or the argument as implying that criminal charges were pending against the witness, and note again that no objection was made to the argument.

B. *Exclusion of Defense Evidence.*

1. *Washburn.*

 Defendant claims that he was erroneously precluded from presenting and/or eliciting evidence to impeach Robert Washburn, a "key" prosecution witness. He identifies that as evidence that Washburn was on probation and was in custody for another offense, giving him a motive for testifying favorably; evidence of a prior felony conviction; evidence of a "character trait" for consumption of narcotics that might support an inference that he was under the influence of narcotics when he observed the car resembling that of Davison in the desert on the night of the murder; and evidence that Washburn had falsely represented himself as an investigator working on the case.

*Davis* v. *Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105], on which defendant relies does not control. In *Davis,* the court held that a defendant had been denied his right to confrontation and cross-examination of a key prosecution witness when he was not allowed to inquire into a prior adjudication that the witness was a juvenile delinquent. The court reasoned that the evidence was relevant to impeach the credibility of the witness by showing that he had a bias arising from his current probationary status. Here, however, prior to sustaining the People's objection that the prejudicial impact of the evidence outweighed its probative value, the court conducted a hearing pursuant to Evidence Code, section 402. The court found that Washburn had not been offered any reward or immunity in the pending case in exchange for his testimony, and had not been offered any benefits related to his probationary status. The court also reasoned that because Washburn's probation was for a misdemeanor, the conviction itself could not be used for impeachment. (Evid. Code, § 788; *People* v. *Lent* (1975) 15 Cal.3d 481, 484-485 [124 Cal.Rptr. 905, 541 P.2d 545].)[22]

In *Davis, supra,* 415 U.S. 308, the trial court believed the state policy governing confidentiality of juvenile proceedings barred any reference to the status of the witness. No weighing of the evidence to determine whether it was sufficiently probative to warrant admission was undertaken. Nothing in the *Davis* opinion suggests that the court intended to abrogate the power of

---

[22] As *Lent* notes, Evidence Code section 788, codified existing law in limiting impeachment by previous crimes to felony convictions. (15 Cal.3d at p. 484.) Impeachment by evidence of prior convictions has been proscribed as evidence of specific instances of misconduct which may not be introduced to attack the credibility of a witness, except as permitted by section 788. Because section 28(d) now makes all relevant evidence admissible in a criminal proceeding except as provided in that section, the evidence is now admissible unless excluded pursuant to Evidence Code section 352.

trial courts to restrict cross-examination, even that by defendants, under well-established principles such as those reflected in Evidence Code section 352, i.e., if the probative value of the evidence "is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, or confusing the issues, or of misleading the jury."

Rejecting a similar claim based on *Davis,* in *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-679 [89 L.Ed.2d 674, 683, 106 S.Ct. 1431], the Supreme Court stated: "Of particular relevance here, '[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' *Davis, supra,* at 316-317. . . . It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant . . . 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish.' " (See also *People v. Dyer* (1988) 45 Cal.3d 26, 46-50 [246 Cal.Rptr. 209, 753 P.2d 1]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 750-751, fn. 2 [230 Cal.Rptr. 667, 726 P.2d 113].)

In the absence of any offer of proof by defendant that Washburn had been threatened with probation violation, or other sanctions, or had been offered incentives for his testimony, the trial court did not abuse its discretion in sustaining the objection. Defendant was afforded ample opportunity to cross-examine Washburn and to attempt to impeach his credibility.[23]

---

[23] The court expressed doubt as to the relevance of an arrest for being under the influence and for possession of a weapon in June 1983, stating that the prejudicial effect would far outweigh the probative value of the evidence for impeachment. The court indicated that if the evidence were allowed in, the prosecution would be permitted to bring out the reason Washburn had the weapon in his possession—alleged threats in connection with the case. Defendant's counsel then elected not to inquire about the arrest. Again, we find no abuse of discretion.

The felony conviction that defendant sought to use for impeachment had been set aside pursuant to Welfare and Institutions Code section 3200, which by incorporation of section 1203.4 precludes its use for impeachment other than in proceedings in which the witness is being prosecuted for a subsequent offense. Defendant argues that the record by which this was determined reflected prior grand theft (§ 487, subd. 3) and auto theft (Veh. Code, § 10851) convictions which defense counsel would have urged as a basis for impeachment had he had the benefit of *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d

██ Nor do we find merit in defendant's claim that the court erred in ruling that since defense counsel had no evidence that Washburn had been using narcotics on December 7, 1982, he would not be permitted to inquire into that possibility on cross-examination. Regardless of whether the evidence was otherwise admissible under Evidence Code section 1100, as evidence of a trait of character from which an inference could be drawn that Washburn's ability to perceive and recall were impaired on that night, the court was well within its discretion in ruling that evidence of such use in June 1983 was too remote to support such suggestive and potentially prejudicial examination of the witness. (See *People* v. *Wright* (1985) 39 Cal.3d 576, 586-588 [217 Cal.Rptr. 212, 703 P.2d 1106].)[24]

Defendant's claim that he was improperly denied the right to present evidence that Washburn had represented himself as a special investigator lacks merit. Defendant was accorded ample opportunity to cross-examine Washburn on this topic. The court did not abuse its discretion in ruling that defendant would not be permitted to call a witness to impeach Washburn on this collateral matter. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 756-753.)

### 2. *Woods*.

Defendant complains next that the trial court erroneously sustained the prosecutor's hearsay objection to testimony by Brenda Woods that in a telephone conversation with her sister in Michigan, the sister stated that she was watching the "Hart to Hart" television program. Defendant hoped to establish through that evidence that the conversation took place on Tuesday, December 7, rather than Wednesday, December 8, and thereby place Elton Juniel, who was believed to be the third participant in the robbery, at Woods's home on that evening. Woods was permitted to testify that she had received the telephone call.

If erroneous, however, the ruling did not prejudice defendant. The court permitted defendant to elicit evidence that a telephone conversation with

---

111]. He did not, however, seek to impeach Washburn with that conviction and we decline defendant's suggestion that we should consider the trial court's ruling as if that conviction had been in issue, or condemn counsel as ineffective for failing to assert the theft offenses for impeachment purposes.

[24] As defendant acknowledges, he was permitted to impeach Washburn through the testimony of Washburn's mother-in-law that he had not had dinner at her home on December 7, 1982, and that she had seen him use alcohol daily, and exhibit the symptoms of a person who used drugs and alcohol in combination. Her opinion that he was a liar who made up stories to gain attention was also admitted.

Defendant's claim that the prosecution was improperly permitted to impeach this witness through expert opinion that she, herself, was imbibing alcohol lacks merit. As defendant notes, the court heard the expert's testimony outside the presence of the jury and ruled that he would not be permitted to offer an opinion on the capacity of the witness on the evening in question, but would have to limit his testimony that she was drinking alcohol at that time.

the sister took place on that date. Kelvin Woods testified that he was sure of the night because he had watched a particular episode of "Hart to Hart" on the night Juniel was with him. Brenda Woods testified that she had received a telephone call from her sister on the night Juniel came to the house to have her do his hair; the night was a Tuesday and could not have been Wednesday as she reserved that evening for personal business; and that she had watched the "Hart to Hart" program while doing Juniel's hair, a three-hour process. Evidence that Brenda Woods was able to recall the day of the week because her sister stated that she was watching the same program would have been cumulative. Exclusion could not have been prejudicial.[25]

Defendant's claim that this "situation" was "exacerbated" by the prosecutor's "disingenuous" attitude toward discovery adds nothing to this analysis. The defense was not given the name of Karen Falls as a person interviewed by the prosecution. Defense counsel sought a mistrial claiming the discovery order had been violated and that he would not have called the witness had he known of her prior statement. The prosecutor argued that he had been required to give the defense only the names and statement of potential prosecution witnesses. The trial court ordered that the statements of any potential defense witnesses also be provided and denied the mistrial motion.

Defendant concedes that a misunderstanding regarding discovery does not require a mistrial, does not argue that a mistrial should have been granted here, and points to no prejudice, arguing only that the prosecution was unfairly permitted to use the defense's own witness to rebut a "crucial" point.

3. *Polygraph evidence.*

The court denied a defense motion seeking to admit evidence of the results of a polygraph examination of defendant administered by the Los Angeles County Sheriff's Department. The court ruled that presentation of the evidence would necessitate undue consumption of time and create a substantial danger of confusing the issue and/or misleading the jury. The basis for that conclusion was the burden on defendant to establish both the reliability of the polygraph procedure and the probative value of the results.

---

[25] In ruling on the prosecutor's objection, the court commented that there was an easier means by which defendant could establish the date, suggesting that counsel should be able to figure it out. Defendant now claims that the failure of the court to educate counsel on how to get this evidence in was improper. (See *People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 456 [161 Cal.Rptr. 634].) We need not consider here the extent to which a trial judge must assist counsel in the presentation of evidence, or whether the failure to do so may properly be asserted as error, since the exclusion of this evidence was so clearly not prejudicial.

The motion was made, and the argument here rests, on the assumption that section 28(d) has eliminated restrictions on the admissibility of polygraph results. ■■ Adoption of section 28(d) did not, however, abrogate generally accepted rules by which the reliability and thus the relevance of scientific evidence is determined. (See *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].) The reliability of a scientific technique, therefore, is determined under the requirement of Evidence Code section 350, that "[n]o evidence is admissible except relevant evidence," a provision necessarily incorporated by reference into Evidence Code section 352, which is expressly preserved by section 28(d).

The court may have considered the admissibility of the evidence under Evidence Code section 352, notwithstanding longstanding precedent holding polygraph results inadmissible (see, e.g., *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 189 [133 Cal.Rptr. 511, 555 P.2d 297]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 763 [114 Cal.Rptr. 467, 523 P.2d 267]), under the compulsion of *Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24 [183 Cal.Rptr. 615]. The *Witherspoon* court concluded that there was no longer any reason to apply a judicially developed rule of exclusion, and held that the petitioner was entitled to a hearing pursuant to Evidence Code sections 402-406, at which he could present evidence on the present acceptance of polygraph examination techniques in the scientific community.

■■ We agree with the observation of Justice Gates, in his concurring opinion in *Witherspoon,* that on a proper showing defendants must from time to time be permitted to demonstrate that advancement in a scientific technique has enhanced its reliability and acceptance in the scientific community, and to establish that the advances warrant admission of a previously excluded category of scientific evidence. Defendant here made no such preliminary showing, however. The applicable rule in this state, one unaffected by either *Witherspoon* or the adoption of section 28(d), is that the admissibility of evidence based on a new scientific technique is determined under the principles of *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145]. (*People* v. *Kelly, supra,* 17 Cal.3d 24, 30.) ■■ Defendant offered only to call the polygraph examiner to establish the manner in which the test was conducted, an offer that was not sufficient to establish the admissibility of the results of the test or the examiner's opinion regarding defendant's veracity. Absent an offer of proof that the polygraph is now accepted in the scientific community as a reliable technique, the evidence was presumptively unreliable and inadmis-

sible. The trial court neither erred in refusing to admit the evidence, nor denied defendant due process by excluding relevant evidence.[26]

### C. *Admission of Evidence.*

■ Defendant contends that the court committed prejudicial error in admitting photographs of the victim over his objection and notwithstanding his offer to stipulate to the identity of the victim, the position of the body, and the path of the bullets.

The admission of photographs is within the discretion of the trial judge, whose exercise of discretion will not be disturbed on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value. (Evid. Code, § 352; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1255-1256 [232 Cal.Rptr. 849, 729 P.2d 115].) There is no question but that the photographs to which defendant objected had sufficient probative value to warrant admission. The location and manner in which the victim was killed was relevant, and the photographs were helpful in illustrating the theory of the prosecution that Fahey had not only been shot at the location where he was found, but had been shot as he was running away from his assailants, hands tied behind his back, and left to die at that site from loss of blood.

The record confirms that as to each photograph to the admission of which defendant objected, the court considered the relevance of the exhibit, and carefully weighed its probative value against the potential prejudicial impact, admitted some while excluding others, and fulfilled its responsibility to expressly rule on admissibility pursuant to the criteria of Evidence Code section 352. Absent a manifest abuse of discretion, one not demonstrated here, defendant may ask no more. (*People* v. *Wade* (1988) 44 Cal.3d 975, 992 [244 Cal.Rptr. 905, 750 P.2d 794].)

### D. *Instructional Error.*

#### 1. *Note-taking.*

■ The court instructed defendant's jury: "You may take notes as the witnesses testify in this matter. You must remember, however, that few

---

[26] In light of this conclusion, we need not consider whether Evidence Code section 351.1, adopted as an urgency statute effective 1983, applies to the trial of defendant in 1984. That section precludes admission in any criminal proceeding of the results of a polygraph examination, the opinion of the examiner, or any reference to taking or offering to take such examination in any criminal proceeding.

The report of the examination, attached to the report of the examiner, stated that it was the examiner's or "expert opinion that Suspect Harris was truthful concerning his answers as to his involvement in the Fahey murder; however, it should be noted that the examiner stated that Suspect Harris was reacting to specific crime questions."

persons can take notes as to each word the witness speaks and at the same time carefully observe the manner in which he testifies." Defendant claims that this instruction was inadequate and that the trial court erred in failing to give a sua sponte cautionary instruction to the jurors regarding not only note-taking during the presentation of evidence, but also against reliance on those notes rather than their independent recollections during deliberations. Failure to give a sua sponte cautionary instruction is not reversible error. We suggested in *People* v. *Whitt* (1984) 36 Cal.3d 724, 747 [205 Cal.Rptr. 810, 685 P.2d 1161], that "the better practice is to give such an instruction." (See also *People* v. *Leach* (1985) 41 Cal.3d 92, 107 [221 Cal.Rptr. 826, 710 P.2d 893].) But, as we stated subsequently in *People* v. *Silbertson* (1985) 41 Cal.3d 296, 303 [221 Cal.Rptr. 152, 709 P.2d 1321], "we did not hold in *Whitt* that a trial court is *required* to give such cautionary instructions."

### 2. *CALJIC 2.20.*

In its instructions to the jury on the factors to be considered in assessing the credibility of a witness, the court failed to include one factor that is among those in the standard jury instructions, CALJIC No. 2.20—the character of the witness for honesty or truthfulness or their opposites. Defendant cites this as error, noting that the veracity of several prosecution witnesses was in issue. In particular, Regina Juniel had testified that Dovie Wilson had told untrue stories on a number of occasions, and Colon Horn had testified that Robert Washburn was known to make up stories and was, in her opinion, a pathological liar.

Assuming that the testimony of these witnesses was admitted as evidence of the character trait of honesty and veracity (see Evid. Code, §§ 780, subd. (e), 786; *People* v. *Jones* (1984) 155 Cal.App.3d 153, 183 [202 Cal.Rptr. 162]; *People* v. *Martin* (1983) 150 Cal.App.3d 148, 159-160 [197 Cal.Rptr. 655]), the instructions were adequate to alert the jury to its obligation to weigh the credibility of these and all witnesses.

 "The general rule is that the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so, but need not instruct on its own motion on specific points developed at the trial." (*People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370].) The jurors were instructed that they were the sole judge of the believability of the witnesses, that they could consider prior consistent or inconsistent statements by a witness in "testing the credibility of the witness," that in determining the believability of a witness they could consider "anything that has a tendency in reason to prove or disprove the truthfulness of the testimony," and that they were not limited in this by the factors suggested by the court. The jurors were also

instructed that the testimony of an informer must be examined with greater care than that of an ordinary witness, and that the testimony of a witness who has made false or deliberately misleading statements concerning the charges being tried should be viewed with distrust. The instructions were adequate to advise the jury on the general principles of law relevant to the determination of witness credibility.[27]

### 3. *Eyewitness testimony.*

Defendant next complains that the court did not give his proposed special instruction on eyewitness identification testimony. The special instructions that were refused would have advised the jury: "In evaluating the testimony of witnesses on the issue of identification you may consider whether or not the witness is of the same race as the individual he is attempting to identify. If the witness is not, you should consider the effect this would have on an accurate identification.

"In evaluating testimony of witnesses on the issue of identification you may consider as a factor that identification from a still photograph is substantially less reliable than identification of an individual seen in person."

The court did instruct, however, pursuant to CALJIC No. 2.91 regarding the relation of reasonable doubt to eyewitness identification, and also gave a special instruction requested by defendant regarding the factors that might be considered.[28] In *People* v. *Wright, supra,* 45 Cal.3d 1126, 1141, we held that a "proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." Either "CALJIC No. 2.92 or a comparable instruction should be given when requested in a case in which identification is a crucial issue and there is no substantial corroborative evidence." (45 Cal.3d 1126, 1144.)

Although cross-racial identification is among the possibly relevant factors included in CALJIC No. 2.92, this is not a case in which substantial evidence to corroborate the eyewitness identifications was lacking. There-

---

[27] We note also that defendant had ample opportunity to point out the relevance of the impeaching evidence related to truth and veracity during his closing argument. He took advantage of this by reminding the jury that Colon Hall had described Washburn as a "pathological liar."

[28] The special instruction was that discussed in *People* v. *Wright* (1988) 45 Cal.3d 1126, 1139 [248 Cal.Rptr. 600, 755 P.2d 1049], modeled after that set out in *United States* v. *Telfaire* (D.C. Cir. 1972) 469 F.2d 552, 558-559 [152 App.D.C. 146].

fore, if the failure to give the requested instruction on this factor was error,[29] it was harmless.[30]

Defendant's request for an instruction that identification from a still photograph is less reliable than that of an in-person identification was based on this court's observation to that effect in *People* v. *Gould* (1960) 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865]. In *Gould,* however, the issue was the sufficiency of evidence when the defendant had been linked to the crime only by an extrajudicial identification of a photograph selected from a small group of photos. Here, the identification of defendant by Donna Rigby is in issue again as she first identified him from a photo in a police photo line-up. Rigby identified both defendants in court, however, testifying that she was sure that defendants were the men she had seen at the dairy. Not only was the identification made from a large selection of photos, but there was no suggestion that her in-court identification was a product of the earlier photo identification. *Gould* therefore does not support defendant's assertion of error.[31]

### 4. *Intoxication.*

Defendant requested, and the court refused, an instruction, that: "In determining the believability of a witness you may consider his capacity to see or hear or remember the facts about which he testified. If you believe that any witness was under the influence of alcohol, drugs, or other intoxicants during the events to which he testified, you must consider whether this condition impaired his capacity to see or hear or remember. You are not obliged to disregard or give little weight to the testimony of a witness whose capacity to see or hear or remember you conclude has been impaired because of a state of intoxication, but you may do so."

In asserting the failure of the court to give this instruction as error, defendant contends that the instruction was necessary to assist the jury in

---

[29] We assume, *arguendo,* although the record does not confirm the assumption inherent in defendant's argument, that witness Rigby was White. The same excerpt from her testimony that suggests this, however, also undercuts the suggestion that her identification may have been affected by cross-racial factors. When asked if she had "a lot of social contacts with Blacks" and if she had "Black friends," she replied affirmatively and when pressed responded, "I have children who call me mom that are Black."

[30] Defendant refers also to the identification of Davison made by Washburn. The record does not indicate Washburn's race, and we note, in any event, that he testified only that Davison looked "similar" to one of the men seen in the gold-colored Cadillac.

[31] Even had there been evidence that Rigby's in-court identification was the product of or was tainted by her view of the photos, it might well have been error to give the requested instruction. As the court explained in *People* v. *Wright, supra,* 45 Cal.3d at page 1137, the defendant's right to "pin-point" instructions is to instructions directed to the theory of the defense, not those aimed at specific evidence. As to the latter, the defendant is free to argue the import of the evidence, but does not have a right to an instruction that would improperly imply the conclusion to be drawn from that evidence.

assessing the reliability of Washburn's testimony since evidence had been adduced that Washburn had been drinking beer, and had at times been seen under the influence of drugs and alcohol. ██ It is improper, however, for the court to single out a particular witness in an instruction, since by so doing the court charge becomes a comment on how the evidence should be considered, rather than a general instruction on a defense theory. (*People* v. *Wright, supra,* 45 Cal.3d at p. 1135, fn. 6; *People* v. *Lyons* (1958) 50 Cal.2d 245, 271 [324 P.2d 556].) The instructions given by the court were adequate to alert the jury to the manner in which the reliability of evidence should be assessed.[32] The court did not err in refusing this requested instruction.

## IV

### SPECIAL CIRCUMSTANCE ISSUES

Only two issues are raised regarding the finding that the murder of Stanley Fahey was committed in the perpetration of robbery and kidnapping: (1) that the jury was not instructed pursuant to *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], that in order to find the special circumstance allegations true the defendant must have intended to kill or to aid a killing; and (2) that the procedure pursuant to which the jury was asked, after the guilt and special circumstance verdicts had been returned, to make a finding on intent to kill was error that violated his constitutional right against double jeopardy.

After reconsideration of the proper construction of section 190.2, subdivision (a)(17), in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], we concluded that our analysis in *Carlos* had been faulty, and held: "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved."

██ In this case the evidence of the identity of the actual killer was circumstantial. That evidence showed, however, that more than one person was involved in the murder. Each of the defendants may have been armed, and either could have fired the shots from the gun that killed the victim. Therefore, since defendant Harris could have been convicted on a theory that he was an aider and abetter, an instruction should have been given that

---

[32] Counsel was able, of course, to invite the jury to consider the impact of this evidence on Washburn's credibility, reminding the jury during closing argument: "He admitted he was drinking that night. He says he drank three beers. . . . He indicates he takes ritalin . . . He indicates that there's no combined effects between that and the other drugs that he takes, which he said were tylenol and valium. He indicates there's no combined effect between those drugs and alcohol. I'd just ask you to use your common sense with regard to that."

if he was to be convicted of murder on that theory, intent to kill was a required element of the felony-murder special circumstance. (Cf. *People* v. *Poggi* (1988) 45 Cal.3d 306 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People* v. *Melton* (1988) 44 Cal.3d 713, 747 [244 Cal.Rptr. 867, 750 P.2d 741].)

It is not possible to determine from the verdicts rendered by the Harris jury that the jury necessarily convicted Harris as the actual killer. The finding that he used a firearm in the commission of the offense does not establish that the jury found that he shot the victim since a "use" finding may be based on displaying a firearm in a threatening manner. (*People* v. *Chambers* (1972) 7 Cal.3d 666 [102 Cal.Rptr. 776, 498 P.2d 1024].)[33]

Nonetheless, the failure to instruct on intent to kill was not prejudicial. The prosecution theory was that defendant was the actual killer, and the evidence that he, not Davison, shot the victim, evidence that included his confessions, was overwhelming. We are satisfied therefore that the omission of this instruction did not affect the verdict and was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Odle* (1988) 45 Cal.3d 386, 415 [247 Cal.Rptr. 137, 754 P.2d 184].)

 Nor is it necessary that intent to kill be found in order to satisfy the Eighth Amendment. The death penalty is not excessive punishment when imposed on a person convicted of a felony murder under a statute restricting imposition to defendants who have actually killed, attempted to kill, or intended to kill. (*Tison* v. *Arizona* (1987) 481 U.S. 137, 150 [95 L.Ed.2d 127, 139; 107 S.Ct. 1676]; *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368].) A finding that one of these criteria has been met need not be made by the jury. (*People* v. *Melton, supra,* 44 Cal.3d 713, 747, fn. 12. See also, *People* v. *Hamilton* (1988) 46 Cal.3d 123, 158 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Robbins* (1988) 45 Cal.3d 867, 885 [248 Cal.Rptr. 172, 755 P.2d 355].) The record in this case, independent of the special finding, clearly establishes that defendant was the actual killer and we so find.[34]

There being no error prejudicial to defendant at the guilt phase of the trial, the judgment of conviction and special circumstance findings must be affirmed.

---

[33] Since Davison was tried by a separate jury the verdict of that jury is irrelevant in determining whether Harris was found to be the actual killer. We note, however, that Davison was not charged with use of a firearm or infliction of great bodily harm on the victim so there was no occasion for the Davison jury to make a finding that would establish which defendant was found to be the actual killer.

[34] In light of this conclusion we need not consider defendant's claim that the special verdict is invalid.

V

PENALTY PHASE ISSUES

At the close of evidence in the penalty phase of the trial, the jury was instructed as follows pursuant to section 190.3 (the Briggs Instruction): "Under the state constitution a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole."

Thereafter, in *People* v. *Ramos, supra,* 37 Cal.3d 136, 150-159, we held that this instruction violated the due process clause of the California Constitution (art. I, §§ 7 & 15) because it is an incomplete and therefore misleading explanation of the Governor's commutation power, and invites the jury to consider speculative and impermissible factors in making its decision as to penalty. When the instruction is given without qualification, as here, reversal of the penalty of death is compelled. (*People* v. *Montiel, supra,* 39 Cal.3d 910, 928. See also, *People* v. *Myers* (1987) 43 Cal.3d 250, 270-271 [233 Cal.Rptr. 264, 729 P.2d 698].)

The People argue, however, that the argument by defendant's counsel in which he described the commutation power as a "cruel hoax" and argued on the basis of statistics that if sentenced to life without parole defendant would die in prison, and would "never walk the streets again" was adequate to avoid the prejudice identified in *Ramos*.[35]

---

[35] Counsel argued: "One thing we should understand right from the beginning, if I might, is that Von Harris is going to die in prison. He will die in prison. He will never walk the streets again. The only question is when will he die in prison. That's the only question. Whether you decide when he'll die or you leave it to God."

Later, after the prosecutor had objected to defense argument that if sentenced to life without parole defendant would never be released, and mentioned the Briggs Instruction, defense counsel continued: "Now, what the prosecutor says to you is 'the Briggs instruction,' which his honor will read to you, is that the Governor of the State of California has the power to commute the sentence of Von Harris. Von Harris, with all his political influence, with all the friends and petitions he can muster to the Governor. I'm sure that the Governor will commute the sentence of Von Harris. In 30 years in California no one on a murder case with life without possibility of parole has ever been commuted and it won't happen with Von Harris.

"Remember the sentence we are talking about is not the sentence that we all read about in the newspapers and we're offended about where someone was sentenced to life in prison and someone would come on and say 'in seven and-a-half years they're eligible for parole.' Remember when you read that? This is not this sentence. That law was changed in these cases. This is an entirely different sentence. This is life imprisonment without the possibility of parole. He cannot be paroled. He spends the rest of his life in prison.

"Now, life without the possibility of parole is not a break. It is not a lenient sentence. By giving you this choice it unfortunately makes it appear to you that somehow if you vote for

We are not satisfied that this argument was adequate to offset the impact of the Briggs Instruction. The Briggs Instruction was called to the attention of the jury when the prosecutor interrupted defense counsel's argument to object that arguing that defendant would spend the rest of his life in prison was a "misstatement." Defense counsel was forced to respond to the anticipated instruction and to that objection defensively by attempting to persuade the jury that defendant was not a person who could hope to persuade the Governor to exercise the commutation power. The prosecutor's assertion that defense counsel had misstated the law by arguing that if sentenced to life without parole defendant would never be released, was reinforced by the court's instruction which confirmed a sentence of life without possibility of parole could be commuted to permit parole.

Rather than diminishing the impact of the instruction as the prosecutor suggests, the argument acknowledged the instruction that would follow and clearly invited the jury to speculate on an irrelevant matter—whether, in light of the commutation power, a sentence of life without possibility of parole would, in fact, ensure that defendant would never be released from prison. (Cf. *People v. Coleman* (1988) 46 Cal.3d 749, 780-782 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People v. Hamilton* (1988) 45 Cal.3d 351, 374-376 [247 Cal.Rptr. 31, 753 P.2d 1109].) The penalty of death must therefore be set aside, and defendant remanded for a new trial on the issue of penalty.[36]

VI

DETERMINATE SENTENCING ERRORS

Anticipating that after retrial of the penalty issue he may be sentenced to a term of life without parole (and by implication that the limitation on parole may at some future date be extinguished), defendant contends that the terms imposed for robbery and kidnapping for robbery must be stayed as these offenses and the murder were part of a continuous transaction. (§ 654; *People v. Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].) He also contends that the trial court erred in imposing more than one enhancement for use of a firearm. (§ 12022.5; *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23].)

The trial court properly stayed the terms for robbery and kidnapping, the stay to become permanent upon completion of the term imposed on the

---

life without possibility of parole, that you're giving him a break. You're excusing his conduct. That cannot be further from the truth. You cannot be lenient if you want to be."

[36] In light of this conclusion we need not consider defendant's other claims of prejudicial error at the penalty phase of the trial or in the ruling on the motion for modification (§ 190.4), or his challenge to the constitutionality of the penalty and the death penalty law.

murder count. Defendant's concern that this stay would not be effective if he is sentenced to a life without parole term for the murder is unwarranted. In staying the lesser terms, the abstract of judgment refers to completion of the "sentence in Count I" and will be effective to continue the stay when defendant is resentenced on that count.

■ With respect to the enhancements for use of a firearm, defendant is correct that section 654 applies not only to terms imposed for the substantive offenses committed during an indivisible transaction having a single intent or objective on a single occasion, but also to enhancements imposed pursuant to section 12022.5. (*In re Culbreth, supra,* 17 Cal.3d 330, 335.) The special circumstance findings of the jury expressly, and the trial court order staying the kidnapping and robbery terms impliedly, establish that these offenses were committed during an indivisible transaction to which section 654 applies. Two-year enhancements were added to the terms for each of the three offenses, but all were stayed by the trial court. No modification of the judgment is presently required.

VII

DISPOSITION

The judgment is reversed insofar as it imposes the penalty of death, and affirmed in all other respects.

Lucas, C. J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

Broussard, J., concurred in the judgment.

**MOSK, J.,** Concurring.—Section 1046 of the Penal Code provides, "Trial juries for criminal actions are formed in the same manner as trial juries in civil actions." Section 194 of the Code of Civil Procedure provides that juries shall consist of 12 persons, or any number less than 12 upon which the parties may agree in open court.

It must be noted that the Penal Code refers to criminal *actions,* not criminal *defendants.* There appears to be no authority for a separate jury for each defendant being tried in one action. In this instance there were two defendants and two juries. Would we be asked to approve of three juries if there were three defendants? Or more if there were multiple defendants?

I make these observations because of my reluctance to approve or encourage the use of multiple juries in one action without statutory authorization. Procedure is a vital part of criminal law. Judges must comply strictly with

the procedural requirements prescribed by the Legislature, and should be hesitant to improvise.

Having expressed my misgivings, I must concede with the majority that the trial in this instance was fairly conducted and that no prejudice to this defendant appears from the two-jury method or from the several other minor errors committed during the course of the proceedings.

Therefore I concur in the judgment.

Appellant's petition for a rehearing was denied April 20, 1989, and the opinion was modified to read as printed above.