Filed 9/14/15  P. v. Yun CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B259587 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA407105) |
| v. | |
| SIMON YUN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles, C. H. Rehm, Jr., Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Simon Yun was convicted following a jury trial of three counts of committing a lewd act upon a 14- or 15-year-old child by a person at least 10 years older than the child (Pen. Code, § 288, subd. (c)(1)) and sentenced to three years in state prison. On appeal he contends the trial court erred in excluding the opinion testimony of his girlfriend/employee that the victim's mother seemed "too nice," was "creepy" and appeared to be engaged with her daughter "in some sort of hustle to shake down Mr. Yun for money." We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Improper Sexual Contact*

D.B. and her then-15-year-old daughter J.B. (also known as Jade) were living in their car after moving from Texas to Los Angeles when they were befriended by Yun. Yun told D.B. and Jade he owned a massage parlor and offered to help them by allowing them to stay in the back room of the massage parlor and giving them jobs (D.B. as an office cleaner; Jade as a masseuse).

Yun told D.B. she could not stay in the building during the day because it was a business. She would leave at 8:00 or 9:00 a.m. and not return until 8:00 p.m. or later. While she was out, D.B. attempted to recruit people to work at the business.

Jade was allowed to stay at the massage parlor during the day. Dulce Jasmine Salas, Yun's girlfriend[1] and an employee at the massage parlor, trained Jade on basic massage techniques on several occasions. Yun was the person receiving the massage. During the training sessions Yun was not wearing clothes, but a towel covered his private parts.

After two or three lessons Yun began instructing Jade himself with Jade still practicing on him. Yun told both Jade and D.B. there was to be no sex involved; Yun and Jade signed a document to that effect. Several further sessions took place without incident. According to Jade, however, during one massage session Yun pushed her hands

---

[1] Although Yun, Jade and D.B. all referred to Salas as Yun's girlfriend, Salas testified she and Yun had never dated and were simply friends.

2

down to his pelvic area and then put her hand on his penis. With his hand on hers, Yun made Jade rub his penis for approximately 20 minutes until he ejaculated. Salas was in the next room, separated by a thin wall from the training room where Yun and Jade were. This episode was repeated four or five times over a three or four week period; Yun always ejaculated.

During Jade's last massage of him, Yun stood up, ran his hand between her legs over her clothing, unbuttoned her jeans and forced his penis inside her anus. He moved his penis in and out for what seemed to Jade to be about 40 minutes and then ejaculated. Jade did not scream or cry out during the incident and did not go to a doctor afterward. Yun cautioned Jade not to tell anyone what had happened.

2. *Jade's Disclosure to D.B.*

According to D.B., several weeks after she and Jade began staying at the massage parlor, Jade became very withdrawn. A few weeks later, on November 3, 2012, they moved into their own apartment. Jade remained withdrawn. Finally, after D.B. repeatedly asked her what was wrong, Jade disclosed Yun had had sexual contact with her. D.B. wanted to confront Yun and arranged a meeting. Yun denied any sexual misconduct had occurred. Yun offered to help D.B. and Jade financially if they needed help, to pay her rent or similar obligations.

D.B. did call Yun and asked for money for various household items. Yun gave D.B. a check for $500 on November 10, 2012 and another check for $200 on November 20, 2012. He may have also given her $300 in cash although D.B. could not recall if it was before or after November 20, 2012. Yun then said there would be no more help. Shortly thereafter, in early December 2012, D.B. and Jade reported the incidents to the police. D.B. also retained a lawyer to file a civil lawsuit against Yun.

3. *The Pretext Telephone Call*

Los Angeles Police Detective Michelle Jacquet arranged a telephone call between Jade and Yun on January 16, 2013. An audio recording of the call was played for the jury.

3

During the call Jade told Yun she wanted an apology from him. Yun responded, "Okay I'm sorry, yeah. Sorry that day, yeah." Jade asked, "Sorry for what?" Yun replied, "That's why, that's why I do, I do my best to, to uh do my best to help you out, uh help [D.] out." Later in the conversation Jade stated, "You made me jack you off." Yun said, "I'm sorry." Jade repeated, "You made me jack you off." Yun replied, "I don't wanna talk all this, all nothing you know. I don't know whatever, you know, that experience you have, whatever. Uh, anything you know that uh if you, anything um, yeah you know. . . . Any, anything you need help, I'll remember, I'll always be there okay."

4. *Yun's Police Interview*

Yun was interviewed by Detective Jacquet on January 23, 2013 following his arrest. Prior to being questioned, Yun was advised of his right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel. (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].) An audio recording of the interview was played for the jury.

During the interview Yun said that at one point Jade had tried to kiss him while massaging him. He told her, "No, we don't do that here," and reminded her the door was open and Salas, his girlfriend, was right outside. Later, Detective Jacquet said that sperm had been found on Jade's underwear and asked Yun how that could have happened. After several noncommittal statements, Yun eventually said, "I'm gonna be more up front with you, Detective. Okay." He then explained, while he was lying down on the table, "She–she did take off her underwear a little bit. Yeah." Jacquet said, "So, she kind of teased you?" Yun replied, "Yeah," but said, "Then, I told her 'Stop.'" Jacquet pressed the point, again asking how Yun could explain the presence of sperm on Jade's underwear. Yun answered, "So, okay. Uh, it just happen—happen very fast. And maybe just . . . tip just rubbed. You know, I don't think went in. Rubbed, yeah. . . . Maybe through the underwear a little bit, you know, yeah."

4

Jacquet repeatedly asked Yun whether during this incident he had inserted at least the tip of his penis into Jade's anus. Finally Yun acknowledged the tip might have been inserted "just a little bit, yeah, I think." Jacquet then suggested, "[T]he tip kind of got in there. Now, when the tip got in there did—uh, she said that she didn't really want to do that. And they, you ignored the—," Yun interrupted and said, "No, I pulled out immediately. I said, 'We don't do that here.'" Yun also eventually conceded, "maybe I just cum a little bit" and said he was sorry his penis had rubbed against Jade.

Although not contending his statement was involuntary or should have been excluded, on appeal Yun notes Detective Jacquet made several false representations during the interview concerning the existence of physical evidence (sperm) to induce a confession. In addition, his appellate counsel observes, Yun had not been provided a Korean language interpreter during the interrogation, as he was at trial.

5. *The Defense Presentation*

The defense theme was that Jade's accusations of lewd conduct were false, made as part of a scheme to extract money from Yun. At the outset of her closing argument defense counsel asked, "What about the money that [D.B.] admitted that she got from Mr. Yun after her daughter told her what supposedly happened to her? What about the fact that [D.B.] did not ever go to the police until after Mr. Yun told [D.B.], there is no more money? What about that? That is a huge issue. What about the fact that [D.B.] never once mentioned getting any money from Mr. Yun to the detective? The same way we didn't hear anything about money from the prosecutor. There is a problem with the prosecutor's case. There is more than one problem, but that is the biggest problem, that there is a huge motive to be lying in this case. Money. These people were desperate. They were on the street . . . . People who need money do what they need to do to get it."

Yun did not testify. During the defense case Salas testified that Yun was a kind person and liked to help people. She also believed he was very gullible. She had never known him to lie.

Salas was always in the room next to the training room when Jade was massaging Yun. Although the walls between the rooms were thin, she never heard Jade scream, cry or complain. She never heard anything she interpreted as inappropriate or sexual.

Yun also presented two character witnesses, the pastor of the church that owned the building in which Yun's business was located and his aunt. Both described Yun as a kind person who helped other people, tithing to his church and giving money to the homeless.

6. *The Evidence Code Section 402 Hearing on Salas's Opinion Testimony*

The trial court considered several evidentiary issues outside the presence of the jury at an Evidence Code section 402[2] hearing. At that hearing the prosecutor asked the court to preclude defense counsel from asking Salas about her impressions of D.B. The prosecutor explained that, according to the witness statement provided by defense counsel, Salas had told the defense investigator she was suspicious of D.B., she seemed too nice, she seemed creepy, and she thought D.B. was a hustler. Those impressions, the prosecutor argued, were inadmissible because speculative and apparently not based on Salas's observation of any particular acts by D.B.

Defense counsel argued Salas's impressions or opinions of D.B. were directly relevant to the defense contention that Jade's false accusations of Yun's sexual misconduct were part of a joint scheme by D.B. and Jade to extort money from him and were admissible under section 1103, subdivision (a). That section provides, in part, that evidence of the character of the victim of a crime, including evidence in the form of an opinion, is admissible if offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. Counsel also explained she intended to ask Salas the basis for her opinions or impressions.

The court granted the prosecutor's request to exclude the testimony, reasoning that section 1103 does not apply to character evidence concerning the complaining witness's

---

[2] Statutory references are to this code unless otherwise indicated.

mother, rather than the complaining witness or victim herself. The court clarified that it was not precluding testimony by Salas that she had observed D.B. engaging in activity (aggressive panhandling, for example) that might have some relevance to the defense's false accusation theory, only testimony regarding her impressions of D.B.

7. *Verdict and Sentencing*

The jury found Yun guilty of three counts of committing a lewd act upon a 14- or 15-year-old child by a person at least 10 years older than the child (Pen. Code, § 288, subd. (c)(1)) and not guilty of sodomy of a person under 16 years old (Pen. Code, § 286, subd. (b)(2)) or the lesser included offense of attempted sodomy. Yun was sentenced to the upper term of three years in state prison on each of the lewd act counts; however, execution of sentence on two of the counts was stayed pursuant to Penal Code section 654. The court also imposed statutory fees, fines and assessments. Because of presentence custody credits, Yun was released immediately.

## DISCUSSION

1. *Standard of Review*

We review the trial court's exclusion of evidence for abuse of discretion. (*People v. Brady* (2010) 50 Cal.4th 547, 558; *People v. Avila* (2006) 38 Cal.4th 491, 577-578.) "A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.) Although Yun alludes to his federal constitutional right to present all evidence of significant probative value to his defense, the application of ordinary state rules to exclude evidence does not implicate the federal Constitution. (*People v. Marks* (2003) 31 Cal.4th 197, 227; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1403.)

2. *Section 1103 Does Not Authorize Opinion Testimony About the Character of Witnesses Other Than the Victim/Complaining Witness or the Defendant*

California law has long precluded use of evidence of a person's character (a predisposition or propensity to engage in a particular type of behavior) as a basis for an

7

inference that he or she acted in conformity with that character on a particular occasion. Codifying the common law, section 1101, subdivision (a), provides, "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."[3] Considering only this statutory language, Salas's opinion that D.B. was a "hustler" was inadmissible to prove D.B. had encouraged Jade to falsely accuse Yun of sexual misconduct to extort money from him. Section 1103, subdivision (a)(1), however, provides an express exception to section 1101, subdivision (a), authorizing the defendant in a criminal action to introduce character evidence, including evidence in the form of an opinion, to prove the victim acted in conformity with that character or trait of character. (*People v. Tackett* (2006) 144 Cal.App.4th 445, 453; see *People v. Wright* (1985) 39 Cal.3d 576, 586-587.)[4]

---

[3] As we discuss, article I, section 28, subdivision (f)(2), of the California Constitution, the Right to Truth-in-Evidence provision of 1982's Proposition 8, repealed all California restrictions on the admission of relevant evidence in criminal actions except those preserved or permitted by the express words of the section itself. In *People v. Ewoldt* (1994) 7 Cal.4th 380, 390-391, the Supreme Court held, whether or not section 1101 was repealed by implication by the Right to Truth-in-Evidence provision, the Legislature had reenacted the statute by the required two-thirds vote in each house. Accordingly, it remains a valid limitation on the admissibility of opinion evidence.

[4] Section 1103, subdivision (a)(1), provides, "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

Section 1103, subdivision (a)(2), authorizes the prosecution to introduce such character evidence to rebut evidence presented by the defendant under subdivision (a)(1). Subdivision (b) permits evidence in a criminal action of the defendant's character for violence under certain specified circumstances. Subdivision (c) concerns evidence of the complaining witness's sexual conduct or manner of dress to prove consent in prosecutions for certain offenses. None of these provisions is at issue in this case.

8

The trial court correctly ruled section 1103, subdivision (a)(1), did not authorize Salas's proposed testimony describing her impressions of D.B. because D.B. was not the victim of the crimes charged in the case. Yun's contention that the scope of this limited exception to the general rule precluding use of evidence of character to prove conduct on a specific occasion should be relaxed to include not only the crime victim but also an individual "directing or controlling the actions of the victim" lacks both legal support and factual foundation.

In *People v. Tackett, supra*, 144 Cal.App.4th 445, the defendant was charged with gross vehicular manslaughter and felony driving under the influence of alcohol. An issue at trial was whether the truck that hit and killed two individuals was being driven by the defendant or his friend, both of whom were intoxicated at the time and were injured in the fatal collision. The Court of Appeal held evidence the defendant's friend had been driving while intoxicated on two earlier occasions was not admissible under section 1103, subdivision (a)(1), to prove the friend was the driver even though the friend had been identified as one of the victims in the charging document. (*Tackett,* at pp. 448-449.) After explaining that the word "victim" does not have a fixed meaning, the court held the Legislature in enacting section 1103, subdivision (a)(1), did not employ the word in the broad sense of anyone injured by the defendant's conduct: "[I]nstead, it intended to use the word in the limited sense of a person at whom the defendant's conduct was directed and whose own conduct could serve to explain, justify, or excuse the defendant's conduct toward that person. This was the existing common law when the Evidence Code was adopted and, as explained by the Law Revision Commission, section 1103 was intended to codify the existing law." (*Tackett*, at p. 455; cf. *People v. Birkett* (1999) 21 Cal.4th 226, 232 [construing Penal Code provisions governing restitution to "a direct victim of a crime"; "[a]s we have previously noted in the context of the restitution statutes, '[a] "victim" is a "person who is the *object* of a crime . . . ."'"].)

Similarly, although there was evidence at trial that Yun had provided money on several occasions to D.B. and, apparently, at least offered money to Jade, no evidence

9

was introduced (or even offered) that would support defense counsel's theory mother and daughter were working together to somehow swindle Yun. Thus, the factual predicate for counsel's argument to expand the scope of section 1103, subdivision (a)(1), beyond the language used by the Legislature was also absent.

   3. *Salas's Impressions of D.B. Were Properly Excluded Under Section 352*

Even if not admissible under the literal language of section 1103, Yun contends Salas's testimony regarding her impressions of D.B. was relevant to the defense theory of false accusations to extort money and thus to Jade's and D.B.'s credibility and should have been permitted by the trial court. (See § 210 ["'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"]; see also § 1101, subd. (c) [nothing in § 1101, subd. (a), making inadmissible evidence of a person's character or a trait of his or her character to prove his or her conduct on a specified occasion "affects the admissibility of evidence offered to support or attack the credibility of a witness"].)[5] In this regard, Yun notes that section 786, which provides "[e]vidence of traits of his character other than honesty or veracity, or their opposites, is inadmissible to attack or support the credibility of a witness," was effectively repealed in criminal cases by the adoption in 1982 of article I, section 28, subdivision (d), of the California Constitution (the Right to Truth-in-Evidence provision of Proposition 8, the Victims' Bill of Rights). (See *People v. Harris* (1989) 47 Cal.3d 1047, 1081 [Proposition 8 "effected a pro tanto repeal" of §§ 786, 787 and 790 in criminal cases]; see also *People v. Wheeler* (1992) 4 Cal.4th 284, 291 ["[w]e and the Court of Appeal have consistently held that in criminal proceedings, section 28(d)

---

[5]    The People contend Yun has forfeited any argument the evidence was admissible other than pursuant to section 1103, subdivision (a)(1), because alternate grounds for permitting the testimony were not raised in the trial court. Yun responds, if his counsel's failure to identify additional grounds for the testimony forfeited the issue, he was denied the effective assistance of counsel. We consider—and reject—Yun's evidentiary claim on the merits, making it unnecessary to address either of those points.

supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of section 28(d) itself"].)[6]

Proposition 8's truth-in-evidence provision, however, expressly retained the trial court's authority to exclude evidence under section 352 if presentation of the challenged testimony, even though relevant, would create undue prejudice, delay or confusion, substantially outweighing its probative value. (Cal. Const. art I, § 28, subd. (f)(2) ["[n]othing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103"]; *People v. Stitely* (2005) 35 Cal.4th 514, 547, fn. 15 ["Proposition 8's Truth-in-Evidence provision, which ended most restrictions on the use of relevant evidence in criminal cases, explicitly exempted *both* Evidence Code section 1103 *and* Evidence Code section 352 from its reach"]; see also *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 178.) "'[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.'" (*People v. Smith* (2007) 40 Cal.4th 483, 512-513.)

Here, Salas's impression that D.B. was "too nice" and "creepy" and her opinion she was a "hustler" had, at most, only minimal probative value on the issue of D.B.'s credibility, let alone the veracity of Jade's accusations of sexual misconduct. (Cf. *People v. Zambrano* (2004) 124 Cal.App.4th 228, 239-240 [lay witness's opinion about the truth of another person's particular statements has no "tendency in reason" to disprove the veracity of the statements].) Moreover, the trial court expressly allowed defense counsel to inquire about specific instances of D.B.'s conduct that may have suggested she was engaged in a scheme to extort money from Yun, explaining as to that evidence "there is

---

[6] Article I, section 28 of the California Constitution was rewritten in 2008 by voter approved Proposition 9, the Victims' Bill of Rights Act of 2008: Marsy's Law. Former article I, section 28, subdivision (d), was renumbered, without substantive change, article I, section 28, subdivision (f)(2).

nothing under Evidence Code section 352 that makes that substantially more prejudicial than probative. And it does seem to have some relevance to the defense theory of the case, so there does not seem to be ground to exclude that kind of testimony at this point." And, as discussed, defense counsel was able to argue from the evidence presented at trial that Jade's accusations were false and that money had provided her and her mother with the motive to lie. Viewed in this context it would have been well within the trial court's ample discretion under section 352 to exclude Salas's suspicion and negative impressions of D.B., even if that testimony were relevant and otherwise admissible.

### DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.

We concur:


ZELON, J.


SEGAL, J.